UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN GRAPHICS INSTITUTE, INC. and CHRISTOPHER SMITH, <br><br> Plaintiffs, <br><br> v. <br><br> ACQUIRED LEARNING, INC., SYSTEMS SOLUTION, INC., JUDEANN STIPE, DEAN NOVOSAT, CLARK EDWARDS and RICHARD WEIN, <br><br> Defendants. | C.A. No. 04-12611-JLT |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO AMEND THE COMPLAINT**

Plaintiffs seek to amend their original Complaint to bring five additional causes of action against certain of the existing Defendants.  Plaintiffs argue that justice requires the amendment because the new allegations are "related" to their original claims and because they are based on "new" information learned from documents received through Defendants' Initial Disclosures and through a third-party subpoena *duces tecum*.  Plaintiffs' arguments are feckless.  With discovery set to close in approximately one month, Plaintiffs' motion proves to be a thinly-veiled attempt to block appropriate discovery into its proposed new claims.[1]

Plaintiffs' motion to amend should be denied, for several distinct reasons.  First, a comparison of the original Complaint with the proposed Amended Complaint demonstrates the substantial difference between the two.  The original Complaint involved two causes of action,

---

[1] Plaintiffs object to extending the discovery deadline as a part of their motion to amend.

both of which were copyright-specific.[2]  Plaintiff is now seeking to add *five additional* causes of action, against only certain of the Defendants,[3] as follows:

- <u>Common Law Misappropriation of Trade Secrets</u> (against Defendants Acquired Learning, Judeann Stipe, Clark Edwards, and Dean Novosat)

- <u>M.G.L. c. 93, § 42 Trade Secret Misappropriation</u> (against Acquired Learning, Stipe, Edwards, and Novosat)

- <u>Breach of Common Law Duty of Loyalty</u> (against Stipe)

- <u>M.G.L. c. 93A Unfair Competition</u> (against Acquired Learning, Stipe, Edwards, and Novosat)

- <u>Tortious Interference with Business Advantage</u> (against Acquired Learning, Stipe, Edwards, and Novosat)

How these five substantive tort claims could ever be considered "related" to the original copyright claims is beyond fathom.

The copyright claim involves the alleged improper use of Plaintiffs' copyrighted course descriptions on Defendants' computer servers.  (Compl. ¶¶ 13-19.)  Plaintiffs' common law unfair competition claim also is copyright-specific, alleging that customers were misdirected by Defendants' use of the copyrighted "content."[4]  (Compl. ¶¶ 29-30.)  ***There is not a single allegation in the original Complaint concerning misappropriation of confidential customer information, breach of any duty of loyalty, violation of Chapter 93A, or tortious interference with a business advantage.***

---

[2] While Plaintiffs now try to make their original unfair competition claims as being broader than it is, it is clear from the allegations in the original Complaint that its unfair competition claim was nothing more than an add-on to its infringement claim under the Copyright Act.

[3] Defendants System Solutions, Inc. and Richard Wein are not subject to the additional claims.

[4] Plaintiffs' unfair competition claim is actually preempted under the federal Copyright Act.  <u>See</u> 17 U.S.C. § 301(a) (stating that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of [the Act]" are subsumed within the Act and preempted by it); <u>see also</u> <u>Data General Corp. v. Grumman Sys. Support Corp.</u>, 795 F. Supp. 501, 505-06 (D. Mass. 1992) (dismissing unfair competition claim as being preempted).

Second, Plaintiffs argument that newly discovered information justifies the proposed amendments falls flat on its face. On the one hand, Plaintiffs claim that the amendments would not prejudice Defendants because they are "related" to the original claims. On the other hand, Plaintiffs claim that they only had a basis to assert the amendments after learning of new information in the course of discovery. Which is it?

Plaintiffs filed the original Complaint eight months ago. If the amendments truly are "related" to the original copyright claims, they could not have been conditioned upon information that was previously unavailable. As noted above, however, the proposed amendments are in no way related to the original copyright claims.

As support for their "newly discovered information" argument, Plaintiffs rely upon the Initial Disclosures provided by Defendants in April of 2005. To claim that information as "new" is pure makeweight. If those Initial Disclosures are truly the basis for the proposed amendments, Plaintiffs have sat on their hands too long to assert new claims now. In fact, Plaintiffs were silent on the possibility of amending the Complaint at the May 12, 2005 Scheduling Conference, three weeks after receiving the Initial Disclosures. Plaintiffs can provide no good excuse for delaying their motion for four months, right before the close of discovery.

Finally, Plaintiffs have not even come close to satisfying their burden of showing that justice requires their proposed amendments, and, as explained herein, Defendants would be severely prejudiced by these eleventh-hour amendments. As a preliminary matter, both parties have briefed motions for summary judgment, which should dispose of both claims in the current Complaint. The proposed amendments also would require substantial additional discovery and, obviously, would unreasonably delay the proceedings. The number of claims would triple, and the new claims would greatly expand the breadth of the triable issues beyond the very limited

copyright-specific claims in the original Complaint.  Additional Initial Disclosures would be required, and the realm of relevant documents and list of relevant witness would increase greatly.  In short, the prejudice to Defendants by allowing the amendments would be significant.

Not to be forgotten, Defendants System Solutions, Inc. ("SSI") and Richard Wein are parties only to the copyright-related claims, and are not targets of Plaintiffs' new allegations.  Not only does that fact undermine Plaintiffs' argument that its original unfair competition claim is "related" to the proposed amendments, it also demonstrates the unfair prejudice that SSI and Wein would suffer as "non-parties" to those amended claims.  Resolution of the copyright claims against them will be delayed, and SSI and Wein will be dragged into messier and significantly more costly litigation.

Plaintiffs' proposed amendments also would be futile.  Each of the new claims would be subject to dismissal under Rule 12(b)(6).  The sole new "factual" paragraph in the proposed Amended Complaint is cursory and provides no specifics about how confidential information was misappropriated.  (See Amended Compl. ¶ 20.)  Notwithstanding the somewhat liberal notice pleadings requirements, justice does not require amending the Complaint to add five additional tort-based claims based solely on bald assertions and conjecture.  Because not one of Plaintiffs' proposed amendments could withstand a Rule 12(b)(6) motion to dismiss, their motion to amend must be denied.

**PROCEDURAL BACKGROUND**

Plaintiffs filed the original Complaint on December 14, 2004, seeking injunctive and monetary relief for Defendants' alleged infringement of copyrighted course descriptions that appear on Plaintiffs' website.  Plaintiffs' accompanying unfair competition claim made no separate allegation of wrongdoing.

On March 24, 2005, this Court issued a Discovery Order.  That Order required the parties to have exchanged and reviewed documents, sworn statements, and a list of persons to be deposed, by April 26, 2005.  On or before April 26, 2005, the parties exchanged documents and submitted their Local Rule 16.1 Joint Statement.  A Scheduling Conference was held on May 12, 2005.  Thereafter, this Court issued another Order regarding discovery, setting a discovery deadline of September 1, 2005.

Following the Scheduling conference, Plaintiffs served voluminous, invasive documents requests, seeking Defendants' training course materials, and all communications with Defendants' customers and prospective customers.  On or about July 1, 2005, Plaintiffs also began serving burdensome subpoenas *duces tecum* on many of Defendants' clients and instructors (independent contractors).

On July 19, 2005, Plaintiffs moved for summary judgment on their copyright claim.[5]

On July 29, 2005, Defendants changed counsel, and the parties agreed to extend the discovery deadline by one month, until October 1, 2005.  Defendants agreed to that modest extension because of the extremely limited nature of the copyright claims, which they believed could be resolved on summary judgment, without the need for additional discovery.  On August 2, 2005, the parties filed a joint motion to extend the discovery deadline by one month.

Eight days later, on August 10, 2005, Plaintiffs filed their motion to amend the Complaint with five additional causes of action.  In conjunction with their motion, Plaintiffs have flatly refused to any further extension of the discovery deadline.

---

[5] Plaintiffs actually first moved for summary judgment on July 18, 2005; however, the Court dismissed that motion for failure to comply with Local Rule 7.1(a)(2).  Plaintiffs then re-filed on July 19, 2005.

On August 12, 2005, Defendants filed their opposition to Plaintiffs summary judgment

motion and cross-moved for summary judgment *on all counts of the Complaint.*[6]

## ARGUMENT

A.     **Fed. R. Civ. P. 15(a) does not allow for an amended complaint where justice does
       not require the amendment, and the Court has the discretion to deny a motion to
       amend where the amendment would cause undue delay and would prejudice the
       defendant, and where the amendment would be futile.**

Pursuant to Fed. R. Civ. P. 15(a), once a responsive pleading is served, a plaintiff's

complaint may be amended only by leave of court, and "leave shall be freely given when justice

so requires." The right to amend, however, is not automatic. This Court has the discretion to

deny a motion to amend for a variety of reasons, including undue delay, undue prejudice to the

opposing party, and futility of the amendment. Forman v. Davis, 371 U.S. 178, 182 (1962); see

Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 933 (1st Cir. 1983) (affirming

denial of motion to amend where undue delay in bringing motion, and additional discovery

would be required); Tiernan v. Blyth, Eastman, Dillon & Co., 719 F.2d 1, 4 (1st Cir. 1983)

(affirming denial of motion to amend where new claims "may well have affected defendants'

planned trial strategy and tactics" and was otherwise prejudicial to defendants); Hayes v. New

England Millwork Distrib., Inc., 602 F.2d 15, 19 (1st Cir. 1979) (affirming denial of motion to

amend due to undue delay and prejudice where amendment was "not contemplated by the

original complaint"); see also Gallerani v. Town of Plymouth, 2003 WL 21696437, *2 (D. Mass.

2003) (**Ex. A**) (denying motion to add "weak" claim that would increase discovery costs);

Bruker Instru., Inc. v. Bay State Moving Sys., 15 F. Supp. 2d 156, 158 (D. Mass. 1998) (denying

---

[6] Both counts of the Complaint should be dismissed because, among other reasons, (1) the statute of limitation has
run for Plaintiffs to assert a claim for copyright infringement, (2) the equitable doctrines of laches, waiver, and
estoppel bar any suit for infringement where the allegedly infringing conduct has gone on for more than seven years,
(3) Plaintiffs cannot recover statutory damages and attorneys' fees where the alleged infringement occurred before
the claimed copyright was registered, (4) Judeann Stipe is not an officer or owner of Acquired Learning, and thus
cannot be vicariously liable for any claimed infringement, and (5) Plaintiffs' unfair competition claim is preempted
by the federal Copyright Act.

motion to amend as futile); <u>Gianfriddo v. Western Union Tel. Co.</u>, 1985 WL 48174, *2-5 (D.

Mass. 1985) (**Ex. B**) (denying motion to amend where undue delay in bringing motion,

additional discovery would be required, and a motion for summary judgment was pending).

      1.    <u>Plaintiffs have not demonstrated that justice requires the proposed amendments</u>.

A fundamental element of allowing a motion to amend under Rule 15(a) is that the

moving party demonstrate that "justice so requires" the amendment.  Here, Plaintiffs have not

even attempted to make that showing.  The sum and substance of Plaintiffs' barebones argument

is that "additional allegations that form the basis of the Amended Complaint are based on the

compelling new information that surfaced during the discovery period."  (Mem. in Supp. at 5.)

That simply is not enough to satisfy Rule 15(a).

The discovery of allegedly "new" information to support claims that involve different

issues of fact and different issues of law does not, as a matter of law, satisfy the "justice so

requires" requirement of Rule 15(a).  Plaintiffs do not (and cannot) assert that they would be

unduly prejudiced by having their motion denied.  The new claims focus primarily on the alleged

misappropriation of confidential customer information by Judeann Stipe and the alleged use of

that information by Acquired Learning.  That is in sharp contrast to the original claims, which

solely concern issues of federal copyright law.  Those claims involve distinctly different

discovery, different witnesses, and a substantially different litigation strategy.  Moreover, the

proposed amendments would drag Defendants SSI and Wein through the muck of several tort

claims that are not even directed at them.  For these reasons, Plaintiffs proposed amended claims

should be brought (if at all) in a separate action.

2.    <u>Plaintiffs can provide no valid excuse for their delay in moving to amend at this late date</u>.

Where, as here, there has been a substantial delay between the date of original filing and the date of the motion to amend, the moving party must show a "valid reason for his neglect and delay." <u>Stepanischen</u>, 722 F.2d at 932; <u>see also</u> <u>Hayes</u>, 602 F.2d at 19-20.  Plaintiffs cannot make that showing here.

Plaintiffs filed the original Complaint in December 2004, and then waited almost eight months before seeking to amend with *five new causes of action*.  The only explanation that Plaintiffs give for that delay is that they discovered "new" information through Defendants' Initial Disclosures and through a single email received from a third-party during the course of discovery.  However, Plaintiffs have asserted that the amendments are not significantly different, and in fact are "related" to the original claims.  If that is the case, the "new" information learned in discovery could not have materially impacted Plaintiffs' assessment of their new claims.[7]

Plaintiffs also claim that their motion is based, at least in part, on Defendants' Initial Disclosures, which they received in April 2005, three weeks before the Scheduling Conference. However, Plaintiffs made no suggestion at the Scheduling Conference that they intended to assert additional causes of action, and they can provide no justifiable excuse for sitting on their hands since April.

3.    <u>Defendants would be unfairly prejudiced by the proposed amendments</u>.

Undue prejudice to Defendants is a ground for denying Plaintiffs' motion to amend.  <u>See</u> <u>Stepanischen</u>, 722 F.2d at 933; <u>Tiernan</u>, 719 F.2d at 4; <u>Hayes</u>, 602 F.2d at 19.  If Plaintiffs' motion is allowed, and if they are permitted to bring five additional causes of action with less

---

[7] By arguing that the proposed amendments are "related" to their original copyright claims, Plaintiffs are clearly trying (albeit unsuccessfully) to demonstrate that Defendants would not be prejudiced by the new claims.

than a month left in the discovery period and with summary judgment motions pending, there can be no doubt that Defendants would be unduly prejudiced.[8]

Both sides have filed motions for summary judgment. Defendants' firmly believe that their summary judgment motion will dispose of the current Complaint, in its entirety. At the very least, the summary judgment motions should significantly narrow the triable issues. It would therefore severely prejudice Defendants to have the claims expanded rather than narrowed at this late date.

It is beyond peradventure that the five tort claims that Plaintiffs propose to add are dramatically different than the existing copyright claims. As such, substantial additional discovery is required to explore those claims. That discovery involves supplemental Initial Disclosures and document requests as well as many more depositions than have been identified to date, at least from Defendants' viewpoint. Defendants would need additional discovery to demonstrate that the customer information allegedly misappropriated is not, in fact, confidential, and that any sales to AGI customers were not tied to any such confidential information. Those showings necessarily involve investigation, including, in all likelihood, depositions of customers to which AGI claims to have lost sales.[9]

The proposed amendments would be particularly prejudicial for Defendants SSI and Richard Wein. Those Defendants are not even subject to the proposed amendments; however, they will invariably incur the additional costs and endure the delays that would accompany the addition of five additional substantive claims.

---

[8] That assumes, of course, that the Court will even rule on the motion to amend before the October 1, 2005 discovery deadline.

[9] Plaintiffs suggest that they would not require additional discovery to prove up their proposed amendments. It would be unfair, however, for Plaintiffs to saddle Defendants with new claims without the benefit of additional discovery. Plaintiffs have made it clear that they object to further extending the discovery deadline.

4.      Plaintiffs' proposed amendments are futile because they could not survive a motion to dismiss.

Futility also constitutes an adequate basis to deny a proposed amendment.  See Carlo v. Reed Rolled Thread Die Co., 49 F.3d 790, 792 (1st Cir. 1995); Demars v. General Dynamics Corp., 779 F.2d 95, 99 (1st Cir. 1985); Bruker, 15 F. Supp. 2d at 158.  A proposed amendment is futile if it cannot survive a motion to dismiss for failure to state a claim under Rule 12(b)(6).  Correa- Martinez v. Arrillaga-Belendez, 903 F.2d 45, 59 (1st Cir. 1990).

Here, not one of Plaintiffs' proposed amendments could survive a Rule 12(b)(6) motion to dismiss.  Because the proposed amendments are futile, Plaintiffs' motion to amend must be denied.

> a.      *Plaintiffs have not sufficiently pled misappropriation of confidential information.*

The proposed amendments depend largely on a single allegation of wrongdoing; namely, the supposed misappropriation of confidential customer information.  Plaintiffs' factually empty allegations of misappropriation, however, do not advance their cause a whit.  To survive a Rule 12(b)(6) motion to dismiss on a claim of misappropriation, Plaintiffs must allege with some specificity the following elements.

(1)  the information in question is a trade secret;

(2)  the plaintiff took reasonable steps to preserve the secrecy of the information; and

(3)  the defendant used improper means, in breach of a confidential relationship, to acquire or use the trade secret.

Data General Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1165 (1st Cir. 1994).

As a preliminary matter, therefore, Plaintiffs must identify the trade secret or confidential information that was supposedly taken, and indicate with some specificity why it should be afforded "confidential" protection.  See Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840

(1972) ("The crucial issue to be determined . . . is whether the information sought to be protected is, in fact and in law, confidential"); Jillian's Billiard Club of Am., Inc. v. Beloff Billiards, Inc., 35 Mass. App. Ct. 372, 375 (1993) (same); Harvard Apparatus, Inc. v. Cowen, 130 F. Supp. 2d 161, 174 (D. Mass. 2001) ("As an initial element of the cause of action, the plaintiff must show that the information constitutes a trade secret").

Upon termination, an employee "may carry away and use the general skill or knowledge acquired during the course of employment." Dynamics Research Corp. v. Analytic Sciences Corp., 9 Mass. App. 254, 267 (1980)  While an employee cannot use confidential business information, information is not "confidential" where it is known outside of the employer's business or where it could easily be acquired or duplicated by others.  Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972); see also William Gallagher Assocs. Ins. Brokers, Inc. v. Everts, 2001 WL 1334763, *6-7 (Mass. Super. Ct. Sept. 6, 2001) (**Ex. C**) (identity of customers and their needs not protectable information); Caley & Whitmore Corp. v. Woodward, 1997 WL 414966, *3 (July 17, 1997)  (**Ex. D**) (information that a competitor could obtain simply by placing a telephone call to a prospective customer is not confidential).

Here, the only supporting "factual" allegation in the proposed Amended Complaint to support a claim of misappropriation states:

> 20.    Upon information and belief, defendants Acquired Learning, Stipe, Edwards and Novosat misappropriated and used, to AGI's determinant [sic], confidential customer confidential [sic] information from AGI's customer lists and customer scheduling database, which constitute AGI's trade secrets.

(Compl. ¶ 20.)  In their actual claim of misappropriation (Count III), Plaintiffs put very little more on the barebones of their allegations, alleging merely that:

> 37.    Upon information and belief, the defendants Acquired Learning, Stipe, Edwards and Novosat have actively participated with each other to misappropriate AGI's trade secrets in its confidential customer list and

confidential customer scheduling database, and AGI has been damages thereby.

(Compl. ¶ 37.)  Such bald assertions, based merely on "information and belief," provide no basis for determining whether the customer lists and scheduling database are, in fact, confidential. Without that showing, a misappropriation claim cannot stand.

Plaintiffs' misappropriation claim also fails to allege that Defendants used improper means, in breach of a confidential relationship, to acquire the loosely-defined "confidential" customer information.  <u>Data General.</u>, 36 F.3d at 1165.  In their motion, Plaintiffs seem to suggest that the mere fact that Defendants contacted their customers demonstrates that they must have received customer information by improper means.  (Mem. in Supp. at 4.)  In his affidavit, Christopher Smith also asserts that several documents from Defendants' Initial Disclosures "appear to indicate" that Acquired Learning "had contacts with customers that were affiliated with AGI or AGI clients."  (Smith Aff. ¶ 24.)  Such conjecture and surmise, however, cannot support the "improper means" element of a claim for misappropriation.[10]

The other "newly discovered" information upon which Plaintiffs rely to support their claim of misappropriation is a single email chain produced by Carl Leinbach concerning a request for information made by Judeann Stipe.  (<u>See</u> Smith Aff., Ex. A.)  Plaintiffs' reliance on that email is misplaced.  Plaintiffs argue that the Leinbach email somehow evidences that Defendant Judeann Stipe "had been directing Carl Leinbach to access AGI's confidential customer scheduling database to send her confidential customer information."  (Pl.'s Mem. in Supp. at 2.)  As noted in the email itself, however, Stipe did no such thing.

---

[10] Much of Smith's self-serving affidavit is based on pure speculation and not based on personal knowledge.  For example, in Paragraph 16, he asserts that "[i]t appears that Ms Stipe wanted the contact information … so that she could try to make a sale."  (Smith Aff. ¶ 16.)  Without any foundation whatsoever, Smith surmises that "Mr. Leinbach obtained this information about AGI's confidential customer by logging onto AGI's confidential customer scheduling database."  (Smith Aff. ¶ 19.)  Smith also speculates that Acquired Learning "appears" to have taken contacts from Plaintiffs' confidential customer list, and hypothesizes that Acquired Learning could not have known to solicit certain customers without access to Plaintiffs' confidential customer database.  (Smith Aff. ¶¶ 25-26.)

The email demonstrates that the sum and substance of Stipe's alleged wrongdoing is that she asked a former colleague for contact information about a Harley Davidson employee, information that easily could have been obtained simply by calling Harley Davidson directly. There is absolutely nothing in the email that suggests that Stipe asked Leinbach to access AGI's confidential customer database or scheduling database, or that he even needed to access those databases to obtain the requested information.

On the contrary, apropos to something completely different (updating his training schedule), Leinbach indicated in his email that he had been *unable* to access AGI's scheduling database, so he could not have misappropriated confidential information even if he had wanted to. The fact that Leinbach also mentioned that Harley Davidson was considering "Flash training in the future" and that AGI was performing "an Illustrator session" for Harley Davidson proves nothing. It is clear that Stipe did not request that information. That information is not "confidential" in any event. See William Gallagher, 2001 WL 1334763, *6-7.

### b.  *Plaintiffs cannot maintain a claim for tortious interference.*

The essence of Plaintiffs' tortious interference claim is that Defendants "interfered with the plaintiffs' business relationships by improperly obtaining information from AGI's confidential customer scheduling database and AGI's confidential customer lists." (Am. Compl., ¶ 67.) Those allegations do not remotely state a claim for tortious interference.

To maintain a claim for tortious interference, Plaintiffs must allege that: (1) they had a business relationship from which it expected economic benefit; (2) Defendants had knowledge of that relationship; (3) Defendants intentionally interfered with that relationship with an improper motive or by improper means; and (4) Plaintiffs suffered damages or a loss of advantage as a direct result of that interference. See Swanset Dev. Corp. v. City of Taunton, 423 Mass. 390, 397 (1996); Kurker v. Hill, 44 Mass. App. Ct. 184, 191 (1998).

As set forth above, Plaintiffs' conclusory rhetoric about misappropriation of confidential information avails them nothing. Putting aside the vapid and redundant recitations, what Plaintiffs actually say is that the mere fact that Defendants solicited Plaintiffs' customers proves that Defendants improperly used "confidential" information to tortiously interfere with Plaintiffs' customer relations and that Judeann Stipe's request for contact information about Harley Davidson was somehow improper. Plaintiffs are utterly unable to show the required improper motive or means that is the heart of any claim for tortious interference.

Contrary to Plaintiffs' suggestion, Defendants are allowed to compete for Plaintiffs' customers. The solicitation of customers in order to compete does not constitute the requisite improper motive or means to support a tortious interference claim. See Saveall v. Demers, 322 Mass. 70, 72-73 (1947) (legitimate competition for a person's services is a justification and defense); see also Schwanbeck v. Federal-Mogul Corp., 31 Mass. App. Ct. 390, 412-13 (1991) (competing for commercial advantage is within the realm of permissible interference), rev'd on other grounds, 412 Mass. 703 (1992); Doliner v. Brown, 21 Mass. App. Ct. 692, 695-96 (1986) (defendant permitted to seek "to acquire the same object, not in order to inflict injury on [the plaintiff], but for his own commercial advantage").

Because Plaintiffs have not alleged (and cannot prove) any improper motive or means by Defendants, their tortious interference claim could not stand.

       *c.*      ***Plaintiffs cannot make out a claim for violation of Chapter 93A.***

To the extent that Plaintiffs' Chapter 93A claim is based on the alleged misappropriation of confidential customer information, it must be dismissed for the same reasons that justify dismissal of Plaintiffs' misappropriation claim. To the extent that Plaintiffs' Chapter 93A claim is based on its copyright infringement claims, it is preempted by the Copyright Act. 17 U.S.C. § 301(a); see also John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 186 F. Supp. 2d 1,

27-28 (D. Mass. 2002); Tingley Sys., Inc. v. CSC Consulting, Inc., 152 F. Supp. 2d 95, 108-10 (D. Mass. 2001).

Plaintiffs' Chapter 93A claim must be dismissed for an independent reason: namely, Plaintiffs cannot show (and have not alleged) that the actions constituting the alleged unfair competition "occurred primarily and substantially within the commonwealth." M.G.L. c. 93A, § 11. As a matter of law, it is not enough if a Massachusetts-based business merely suffers a loss in Massachusetts, particularly where customers affected by the alleged unfair trade practices are outside Massachusetts. Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 47-48 (1st Cir. 2001); Garshman Co. v. General Elec. Co., 176 F.3d 1, 15 (1st Cir. 1999); Boston Hides & Furs v. Sumitomo Bank, 870 F. Supp. 1153, 1166-67 (D. Mass. 1994). Because none of the allegedly unfair competition occurred in Massachusetts, Plaintiffs' could never maintain a claim against Defendants under Chapter 93A.

> **d.    Plaintiffs cannot maintain a claim for breach of the duty of loyalty against Judeann Stipe.**

Plaintiffs make a vague and unsupported allegation that Stipe has breached a duty of loyalty owed to AGI by misusing and misappropriating "AGI's confidential information that was entrusted to her while she was employed at AGI." (Am. Compl. ¶ 51.) Nowhere else in the proposed Amended Complaint do Plaintiffs even suggest that Stipe misused confidential information while employed at AGI. On the contrary, the "newly discovered information" on which Plaintiffs rely for their motion to amend specifically concerns activities that occurred *after* Stipe left AGI.

Claims for breach of the duty of loyalty are rarely asserted. Such claims typically involve executives or managers who usurp a corporate opportunity while still employed at the company or who arrange to solicit employees to leave with them to start a competing business. See August,

Inc. v. Aegis, Inc., 409 Mass. 165173-74 (1991); Barden Cream & Milk Co. v. Mooney, 305 Mass. 545, 546 (1940); BBF, Inc. v. Germanium Power Devices Corp., 13 Mass. App. Ct. 166, 171-72 (1982).  The essence of such of claim, therefore, is that defendant have the power to usurp an opportunity or to take employees and that the wrongful act was committed while the employee was still employed.

Here, there is no allegation that Stipe solicited employees or usurped corporate opportunities of AGI before she terminated her employment there.  Indeed, Plaintiffs do not allege, and do not argue, that Stipe took with her any confidential information.  Again, the crux of Plaintiffs' motion to amend concern Stipe's allegedly improper request (of Carl Leinbach) for Harley Davidson contact information, *after she left AGI*.

Plaintiffs are grasping at straws to keep Stipe as a Defendant.  They are particularly frustrated that Stipe left AGI and then started working for Acquired Learning.  They also realize that their copyright claims against Stipe are frivolous and will not survive summary judgment, because Stipe is not an officer or owner of Acquired Learning and thus could never be vicariously liable for any alleged copyright infringement.  Plaintiffs' unsupported and repeated legal assault on Stipe is an abuse of the litigation process and must come to end.  See M.G.L. c. 12, § 5L; see also Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 776 (1986); Vittands v. Sudduth, 49 Mass. App. Ct. 401, 406 (2000).

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court <u>deny</u> Plaintiffs'

Motion to Amend the Complaint and that the Court put an end to Plaintiffs' unjustified and

persistent abuse of the legal process to harass and annoy Defendants.

Respectfully submitted,


 /s/ Jason W. Morgan
Jason W. Morgan (BBO #633802)
Drohan, Hughes, Tocchio & Morgan, P.C.
175 Derby Street, Suite 30
Hingham, MA  02043
Tel.:  (781) 749-7200
Fax:  (781) 740-4335
Dated:  August 25, 2005                          jmorgan@dhtmlaw.com


**<u>CERTIFICATE OF SERVICE</u>**

I, Jason W. Morgan, hereby certify that on August 25, 2005, service of the foregoing was
made on all counsel of record through the Court's CM/ECF on-line docket system.

 /s/ Jason W. Morgan
Jason W. Morgan

- 17 -



Not Reported in F.Supp.2d                                                      Page 1

Not Reported in F.Supp.2d, 2003 WL 21696437 (D.Mass.)

**(Cite as: 2003 WL 21696437 (D.Mass.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.


United States District Court,
D. Massachusetts.
Michael GALLERANI, Plaintiff
v.
THE TOWN OF PLYMOUTH; Eleanor Beth,
Individually and as Town Manager; Lee
Hartmann, Individually and as Assistant Town
Manager; and Kenneth A. Tavares,
David F. Malaguti, David J. Rushforth, Christopher
R. Lombard, all individually
and as members of the Board of Selectmen,
Defendants
**No. Civ.A. 01-10551-GAO.**

May 1, 2003.

*MEMORANDUM AND ORDER*

OTOOLE, J.

**\*1** Michael Gallerani brought this nineteen-count
law suit against the Town of Plymouth and six
individual defendants asserting that he was
improperly terminated by the Town from his
position as Executive Director of the Office of
Economic Development. After the defendants
moved for summary judgment on all counts,
Gallerani responded with a motion to amend his
complaint. The proposed new complaint names only
three of the original defendants and trims the claims
from nineteen counts to five. By the proposed
amendment, the plaintiff essentially concedes that
the original claims now omitted are not viable, and
that the defendants not included in the amended
complaint should be dismissed from the case.

The defendants oppose the motion to amend
because they say the amended complaint adds
completely new theories of recovery too late in the
life of the case. Further, to the extent that the
proposed amended complaint reasserts theories that
were presented previously, the defendants
argue that they are entitled to summary judgment on those
claims. For the reasons discussed below, the
plaintiff's motion to amend is granted in part and
denied in part, and the defendants' motion for
summary judgment is denied as to the complaint as
permitted to be amended.

A. *Summary of Facts*

Gallerani's original complaint and the defendants'
motion for summary judgment together paint the
following picture, stated favorably to the plaintiff.
Gallerani worked for the Town of Plymouth
beginning at least in 1988 when he was appointed
as the Executive Secretary of the Plymouth
Development and Industrial Commission. In 1991,
after the Town revised its charter, the Development
and Industrial Commission was renamed the Office
of Economic Development and Gallerani's title was
changed to Executive Director of the Office.

In 1996, Gallerani began to have difficulties with
defendant Kenneth A. Tavares, who at the time was
the chair of the Town's July Four Committee.
Troubles began when Gallerani told Tavares that he
would have to arrange adequate rest room facilities
for the Fourth of July celebrations. Tavares
allegedly responded by verbally upbraiding
Gallerani and calling him profane names.
According to Gallerani, Tavares verbally attacked
him on several occasions thereafter.

In 1997 and 1998, Tavares made several attempts
to have Gallerani removed from office. In May
1997, after Tavares was elected to the Board of
Selectmen, he allegedly told the Board's Chairman,
Roger Silva, that Gallerani should be removed from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2003 WL 21696437 (D.Mass.)

**(Cite as: 2003 WL 21696437 (D.Mass.))**

this position. Silva, however, opposed Gallerani's removal. In May 1998, Tavares spoke to Donald Jacobs, the Town Manager at the time, and again expressed his desire to have Gallerani removed. Jacobs refused to fire Gallerani and told Tavares that he felt Gallerani was doing a good job.

Thereafter, Jacobs resigned as Town Manager and defendant Eleanor Beth was appointed Town Manager. According to Gallerani, once Tavares was on the Board of Selectmen and Beth was the Town Manager, they made his job very difficult for him. He claims they excluded him from important meetings, required him to submit detailed biweekly activity reports, and verbally harassed him. At one point Beth informed Gallerani that all five members of the Board of Selectmen "have you." Gallerani also claims that at a Town Meeting held on November 1 and 2, 1999, Tavares and other members of the Board of Selectmen made insulting statements about his job performance. At the meeting, these Board members expressed their view that the Town needed to hire outside professional consultants to help design an economic development plan because the Town's economic development staff could not handle the problems facing the Town on their own.

**\*2** In response to what he perceived as harassment, Gallerani told Beth on several occasions that he was experiencing workplace stress and that he was seeking the aid of his physician and a mental health counselor. On November 7, 1999, Gallerani announced in an e-mail that he was going on medical leave. His mental health counselor, Mark Dunay, advised Beth of Gallerani's mental health issues and his need for medical leave. Before Gallerani left for his time off, he cleaned out his desk and deleted his e-mails. On November 10, 1999, Beth sent Gallerani a letter stating that because Gallerani had cleaned out his office she had concluded that he had "abandoned and effectively resigned from" his position. The letter went on to state that Beth accepted this "resignation" effective November 8, 1999. Gallerani wrote back to Beth stating that he did not intend to resign and reiterating that he was on medical leave. Skeptical about Gallerani's claimed medical condition, the

Town asked Dr. Glenn Cahn to examine him. Dr. Cahn concluded that Gallerani was fit for duty and was not suffering from undue levels of stress.

Four months later, Gallerani returned to work. After he returned, he received an e-mail from Beth stating that his staff had complained about him and that further action would be taken. A meeting among Gallerani, Beth, other Town officials, and two representatives from Gallerani's union was held April 26, 2000. At the meeting, Gallerani was asked to resign because of what were said to be numerous complaints about him, although the Town officials present would not let Gallerani see copies of the complaints. When Gallerani refused to resign, Beth handed him a letter of termination, and he was escorted out of the building by a police officer.

B. *Gallerani's Motion to Amend*

Amendments to pleadings are to be freely allowed "when justice so requires." Fed.R.Civ.P. 15(a). But this rule does not give Gallerani anything close to an automatic right to amendment, especially when his motion to amend comes after the close of discovery and after the defendants have moved for summary judgment. *See e.g., Torres-Rios v. LPS Labs.,* 152 F.3d 11, 16 (1st Cir.1998) (motion to amend complaint filed after close of discovery and after defendant's motion for summary judgment properly denied). Moreover, a motion to amend may be denied if it is futile or if the defendants would suffer undue prejudice if the amendment were allowed. *See Hayes v. New England Millwork Distribs.,* 602 F.2d 15, 19 (1st Cir.1979)(citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)). If a plaintiff files a motion to amend his complaint after the discovery period has ended, the burden is on him "to give a valid reason for having waited so long to file his motion." *Grant v. News Group Boston, Inc.,* 55 F.3d 1, 6 (1st Cir.1995).

As an explanation for his late filing of the motion to amend, Gallerani states that upon review of the defendants' motion for summary judgment he concluded "that it would be appropriate to eliminate certain defendants and a number of claims." *Pl.'s Mot. to Am.* ¶ 4. He also notes that he had

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 3

Not Reported in F.Supp.2d, 2003 WL 21696437 (D.Mass.)

**(Cite as: 2003 WL 21696437 (D.Mass.))**

informed the defendants and the Court at a status conference held a few days before the defendants filed their motion that he thought he might need to amend his complaint. Gallerani argues that amendment is particularly appropriate here because he is simply eliminating claims and defendants, thereby "providing a more focused explanation of his claims." *Pl.'s Mot. to Am.* ¶ 8. The amended complaint only names Tavares, Beth, and the Town as defendants. The five (as opposed to nineteen) claims asserted are for "Unconstitutional Discharge Based on Political Affiliation with the Silva Faction" (Counts I and III), "Unconstitutional Discharge in Violation of the Equal Protection Clause" (Counts II and IV), and "Wrongful Termination and Discrimination Against Person with Mental Illness in Violation of M.G.L. c. 151B" (Count V).

**\*3** The defendants concede that the chapter 151B claim was asserted in the original complaint, but they contend that the political affiliation and equal protection claims are new. In Count I of the original complaint, Gallerani stated that the plaintiffs had deprived him of:

> his rights of association and speech guaranteed under the First Amendment to [the] U.S. Constitution, his rights under the Due Process clause guaranteed by [the] Fifth and Fourteenth Amendments to the U.S. Constitution to enjoy those privileges essential to the orderly pursuit of happiness by free men, his rights to equal protection of the laws guaranteed by the Fourteenth Amendment to said Constitution.

*Complaint* ¶ 105. Thus, it appears that an equal protection claim and a First Amendment claim are at least nominally included in the original complaint. The defendants' objection is that, aside from the general invocation of various provisions of the Constitution, the complaint did not plead facts that would justify a reader in concluding that the claims intended were those now described in more detail in the proposed amended complaint. In other words, the defendants say that while the original complaint may have been intended to assert *some* First Amendment claim, there is no description there of the claim set forth more particularly in the amended complaint.

It is difficult to discern what kind of First Amendment claim (if any) is asserted in the original complaint. In any event, the defendants are correct that the political affiliation theory was not included in the original complaint. Almost all of the specific factual allegations in the amended complaint supporting the assertion that there were competing political factions in the Town were not in the original complaint. *See e.g., Proposed Am. Compl.* ¶ ¶ 15, 21, 51, 52, 54, 55. For example, the amended complaint states for the first time that Gallerani and his father were active supporters of the "Silva Faction," and that Beth and Tavares acted jointly "to punish Gallerani for his association with the Silva Faction." *Id.* ¶¶ 51, 55. These allegations were not in the original complaint.

Allowing the political affiliation theory of liability to go forward would unfairly prejudice the defendants who were not reasonably put on notice by the original complaint, notwithstanding the general reference to the First Amendment, that the plaintiff was pressing such a theory. As a result, the defendants say, they have not pursued discovery concerning the theory. *See also Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 933 (1st Cir.1983) (proper to deny motion to amend complaint to add additional reason for bad faith termination when allowing motion would have required additional discovery). Delaying the trial and placing additional discovery costs on the defendants is also particularly inappropriate in light of the seeming weakness of the political affiliation theory. The amended complaint does not contain much by way of specific allegations tending to show that his problems with the defendants stemmed from the fact that he belonged to the wrong political faction. Instead, most of the specific allegations support the proposition that the defendants harbored personal dislike for Gallerani, which is not an adequate basis for a claim that he was terminated because of political affiliation. *See also Correa-Martinez v. Arrillaga-Belendez,* 903 F.2d 49, 58 (1st Cir.1990)(mere allegation that there was a "politically charged atmosphere" at the time of the termination and that plaintiff had ties with members of the opposing political faction does not establish a First Amendment claim). It is not necessary to go so

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4

Not Reported in F.Supp.2d, 2003 WL 21696437 (D.Mass.)

**(Cite as: 2003 WL 21696437 (D.Mass.))**

far as saying that Gallerani could not have established such a claim. It is enough to note that the weakness of his claim further supports prohibiting its late addition to the case.

**\*4** Gallerani's equal protection claim stands on different footing. The only new facts that the amended complaint alleges regarding this claim are the names of three other town employees who he believes were sanctioned less severely for their work-related problems than he was. To bring a successful claim under the equal protection clause, Gallerani must demonstrate that the defendants purposely subjected him to worse treatment than other similarly situated Town employees, and that the defendants were motivated by an "intent to inhibit or punish [his] exercise of constitutional rights, or malicious or bad faith intent to injure [him]." *See Rubinovitz v. Rogato,* 60 F.3d 906, 910 (1st Cir.1995). The defendants were on notice, by the original complaint, that Gallerani would intend to identify other Town employees who had been the subject of complaints but who were not terminated as a result. If the defendants had wanted to force Gallerani to name specific individuals sooner, they had options: they could have moved to dismiss his equal protection claim for failure to state a claim, to which Gallerani would likely have had to respond with more specifics, or they could have used discovery tools to prod him to reveal the information. The specific naming of individuals in the amended complaint has not introduced a new theory to the case, it has simply added some specifics to an existing one.

Accordingly, Gallerani is granted leave to file an amended complaint that asserts the claims set forth in Counts II, IV, and V of his proposed amended complaint. All other claims and defendants as they appear in the original complaint are dismissed.

C. *Defendants' Motion for Summary Judgment*

It remains to consider the merits of the defendants' summary judgment motion as it pertains to the claims of denial of equal protection (Counts II and IV) and of employment discrimination under chapter 151B (Count V). Through affidavits from

himself and others in the Town, Gallerani has produced sufficient evidence to demonstrate the existence of a genuine issue as to a material fact concerning the equal protection claim. The affidavits would support an inference that the defendants' motivation to terminate him may have been malicious or that they had a bad faith intent to injure him. The defendants have responded that their true motivation was the legitimate concern that arose from complaints that Beth had received from Gallerani's co-workers. The jury will have to determine whose version is correct. *See Rodriguez-Rios v. Cordero,* 138 F.3d 22, 25 (1st Cir.1998) (generally, motivation is a question of fact for the jury).

Section 4 of chapter 151B makes it unlawful for the Town to discharge an employee "because of his handicap...." Mass. Gen. Laws ch. 151B, § 4(16). There is a material dispute between the parties as to whether Gallerani has a handicap. Assuming for present purposes that Gallerani can show that he suffered from a requisite disability, there is little in the record to support his claim that he was terminated "because of" his mental health problems. Instead, it seems that the Town did not believe that Gallerani was suffering from any mental illness, and that it terminated him either because Beth and Tavares did not like him, or because he was unable to get along with his co-workers, but not because he was disabled.

**\*5** Massachusetts law has a fairly low threshold for making an initial showing of discrimination on the basis of disability. In *Dartt v. Browning-Ferris Indus.,* 691 N.E.2d 526 (Mass.1998), the Massachusetts Supreme Judicial Court ("SJC") held that to establish a prima facie case:

a plaintiff must present credible evidence that (1) he is handicapped within the meaning of the statute; (2) he is qualified to perform the essential functions of the job with or without reasonable accommodation; (3) he was terminated or otherwise subject to an adverse action by his employer; and (4) the position he had occupied remained open and the employer sought to fill it. *Id.* at 528. Notably, these four criteria do not require that the plaintiff produce evidence that his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 5

Not Reported in F.Supp.2d, 2003 WL 21696437 (D.Mass.)

**(Cite as: 2003 WL 21696437 (D.Mass.))**

handicap was the motivation for his termination. Once the plaintiff has established a prima facie case of discrimination, the defendants may counter "by articulating a lawful reason or reasons for its employment decision and producing credible evidence to show that the reason or reasons advanced were the real reasons." *See Abramian v. President & Fellows of Harvard Coll.,* 731 N.E.2d 1075, 1084 (Mass.2000) (citations and quotations omitted). Here, the defendants have not offered much specific evidence regarding their motivations; they rely largely on their general assertions that Gallerani was terminated because of complaints by co-workers. On the current record, it cannot be said that Gallerani would be unable to show at trial that the defendants' asserted reasons for terminating him were pretextual. *See id.* at 1085 (after employer has shown that there were legitimate reasons for terminating the plaintiff, the plaintiff must show these reasons were merely pretextual and defendants' real motivation was to discriminate). There are genuine disputes concerning material facts, and summary judgment is not appropriate.

D. *Conclusion*

Gallerani's motion to amend his complaint (docket no. 35) is GRANTED to the extent that an amended complaint may be filed that asserts the claims set forth in Counts II, IV, and V of the proposed amended complaint. All defendants are dismissed except for the Town of Plymouth, Kenneth Tavares, and Eleanor Beth. Gallerani's motion to amend his complaint to add a claim for unconstitutional discharge based on his political affiliations is DENIED. The defendants' motion for summary judgment (docket no. 25) is DENIED.

It is SO ORDERED.

Not Reported in F.Supp.2d, 2003 WL 21696437 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

• 1:01CV10551  (Docket)

(Apr. 02, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                   Page 1

Not Reported in F.Supp., 1985 WL 48174 (D.Mass.)

**(Cite as: 1985 WL 48174 (D.Mass.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.
Vincent A. GIANFRIDDO, Plaintiff
v.
WESTERN UNION TELEGRAPH COMPANY,
Defendant.
**Civ. a. No. 84-3273-MA.**

June 7, 1985.
Christy A. Pano, Pano & Maloney, Worcester,
Mass., for plaintiff.

Philip Moss, Morgan, Brown & Joy, Boston,
Mass., for defendant.

*MEMORANDUM AND ORDER*

MAZZONE, District Judge.

**\*1** In this action, the plaintiff, Vincent A.
Gianfriddo, alleges that his employer, Western
Union Telegraph Company, discriminated against
him because of his age. The case is presently
before the Court on the plaintiff's motion for leave
to amend the complaint and the defendant's motion
for summary judgment. Some essential facts and a
chronology of this action's procedural course will be
helpful as the background against which these
motions are resolved.

The plaintiff has worked for the defendant since
1940. In 1981, the plaintiff was appointed District
Sales Manager in the Worcester office. According
to the defendant, the plaintiff was informed by his
supervisor, John Alexander, on December 1, 1982
that he would be demoted.

The plaintiff's demotion was implemented on
January 1, 1983. After being demoted, the plaintiff
remained with the defendant as a Senior Accounts

Representative. It appears to be undisputed that
the compensation received by the plaintiff increased
in 1983 despite his demotion. *See* Plaintiff's
Deposition at 90-91.

The plaintiff believes that he was demoted solely
because of his age. Accordingly, he filed an age
discrimination complaint with the Massachusetts
Commission Against Discrimination (MCAD) on
June 27, 1983. On September 18, 1984, pursuant
to Mass.Gen.Laws ch. 151B, § 9, the plaintiff
removed his complaint from the MCAD and
commenced a civil action against the defendant in
the Massachusetts Superior Court. The defendant,
a New York corporation, removed the action to this
federal court on October 15, 1984.

On October 19, 1984, the defendant filed its
answer and counterclaim in this Court. On that
same day, the defendant moved to strike the
plaintiff's claims for damages in Counts I and II of
the complaint. The defendant also moved to strike
Count III in its entirety. Count III set forth a claim
against the defendant in the amount of $500,000 for
the infliction of emotional distress.

On October 29, 1984, a Scheduling Order issued
from this Court. That Order established a
three-tiered timetable for the progression of this
case. First, it was ordered that additional parties be
joined and pleadings amended within thirty days of
the date of the Order, October 29, 1984. Second,
all dispositive motions were to be filed within thirty
days of October 29, 1984, and responses to those
motions were to be filed within ten days thereafter
pursuant to Local Rule 12. Third, discovery was to
be completed within six months of October 29,
1984, or within six months of the Court's decision
on dispositive motions. Finally, the Order stated:

Additional time will be granted for good cause
shown. Requests shall be in writing and shall
contain the reasons for the request, a summary of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 2

Not Reported in F.Supp., 1985 WL 48174 (D.Mass.)

**(Cite as: 1985 WL 48174 (D.Mass.))**

discovery which remains to be taken, and a date certain when the requesting party will complete the additional discovery, join other parties, amend the pleadings or file motions. The Court may then enter a final scheduling order, if necessary.

On November 7, 1984, the defendant's motion to strike the claims for emotional distress damages and Count III in its entirety was allowed. Two weeks later, the Court allowed the parties' joint request for an enlargement of the time set in the Scheduling Order for the filing of dispositive motions. As the parties had requested, the deadline for dispositive motions was extended until thirty days after the parties received a transcript of the plaintiff's deposition testimony.

**\*2** The defendant filed its dispositive motion--a motion for summary judgment--on January 17, 1985. Despite the requirement in this Court's Scheduling Order and the mandate of Local Rule 12, however, the plaintiff did not file a response to the defendant's motion for summary judgment within ten days. Instead, twenty-five days later, the plaintiff filed a motion for an extension of time. This motion was allowed by an Order dated February 25, 1985. In accordance with his request, the plaintiff's deadline for filing a response was extended until March 26, 1985. This Court's order made it clear that "[n]o further extensions will be granted." Nevertheless, March 26, 1985 came and went with no response filed by the plaintiff.

Twenty days after the final deadline set by this Court, the plaintiff filed documents with the Clerk. The plaintiff's submissions included a motion for leave to amend the complaint and a proposed amended complaint. The plaintiff also submitted a memorandum in opposition to the defendant's motion for summary judgment. These filings prompted a further exchange of supplemental and reply memoranda concerning the two motions now before the Court.

I. THE PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT

Presently, the plaintiff's complaint asserts claims

for relief under the Massachusetts discrimination statute, Mass.Gen.Laws ch. 151B and common law theory for breach of an implied covenant of good faith and fair dealing. The plaintiff seeks leave to amend the complaint in order to add several federal claims under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 623(a), 623(a)(1) and 623(a)(2). In substance, these claims are virtually identical to the state claims already asserted under the Massachusetts discrimination law. *Compare* 29 U.S.C. § 623(a)(1) with Mass.Gen.Laws ch. 151B, § 4.

The ADEA claims differ, however, in three respects. First, unlike the plaintiff's state law claims, Counts IV and VI of the proposed complaint advance claims of willful age discrimination in violation of the ADEA. Second, because the plaintiff has alleged willful age discrimination in the proposed complaint, the ADEA provides a three-year statute of limitations for these claims instead of the shorter limitations period applied under the Massachusetts discrimination statute. *Compare* 29 U.S.C. § 626(e) *with* Mass.Gen.Laws ch. 151B, § 9. *See also Kazanas* v. *Walt Disney World Co.,* 704 F.2d 1527, 1528 (11th Cir.), *cert. denied,* 104 S.Ct. 425 (1983) (Three-year statute of limitations for willful violations under the ADEA). Third, the ADEA states that the plaintiff may recover liquidated damages. 29 U.S.C. § 626(b).

Under Fed.R.Civ.P. 15(a), leave to amend a pleading "shall be freely given when justice so requires." In *Foman v. Davis,* 371 U.S. 178 (1962), the Supreme Court addressed the operation of Fed.R.Civ.P. 15(a). In *Foman,* the Court advised:

In the absence of any apparent or undeclared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies or amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.,--the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court....

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1985 WL 48174 (D.Mass.)

**(Cite as: 1985 WL 48174 (D.Mass.))**

*3 *Foman v. Davis, supra,* 371 U.S. 178, 182.

Federal courts have followed the Supreme Court's guidance in *Foman* and exercised their discretion to deny leave to amend when a belated amendment would result in undue delay and prejudice the opposing party. *See, e.g., Hayes v. New England Millwork,* 602 F.2d 15, 19-21 (1st Cir.1979) and *Troxel Mfg. Co. v. Schwinn Bicycle Co.,* 489 F.2d 968 (6th Cir.1973).

In the instant case, leave to amend is a matter within this Court's discretion because of the timing of the motion, and the nature of the plaintiff's proposed claims. The plaintiff seeks leave to amend his complaint at an advanced stage of the case in order to state an alternative theory of recovery under the ADEA. The motion for leave to amend comes six months after this action was transferred to the Federal Court and two months after the defendant moved for summary judgment. Depositions of the plaintiff and the defendant's principal actor in this dispute, John Alexander, have been completed. Nevertheless, despite the passage of time and the advancement of discovery, none of the plaintiff's proposed ADEA claims are based upon facts that were not known to him at the time of this action's commencement.

Whenever a considerable amount of time has elapsed between the filing of the complaint and a motion for leave to amend, the movant has the burden to "show some valid reason for his neglect and delay." *Hayes v. New England Millwork, supra,* 602 F.2d 15, 19-20. *See also Freeman v. Continental Gin Co.,* 381 F.2d 459, 468-69 (5th Cir.1967). Satisfaction of this burden is even more compelling when the movant seeks leave to assert an alternative theory of recovery which could have been stated at the outset. *See* C. Wright & A. Miller, 5 Federal Practice and Procedure, § 1473 (1971).

In the case at bar, the plaintiff has not satisfied his burden. The plaintiff has not articulated a reason why the alternative theory of recovery under the ADEA was not asserted earlier and the record does not reveal any justification for the plaintiff's

tardiness. The addition of the ADEA claims could not have been delayed by discovery because no new facts were required to state a claim under the federal counterpart to the state cause of action originally advanced by the plaintiff. Furthermore, this is certainly not a case in which the plaintiff's failure to amend the complaint at an earlier stage in the proceedings was caused by this Court. *See, e.g., Farkas* v. *Texas Instruments, Inc.,* 429 F.2d 849, 851 (1st Cir.1970) (delay acceptable where the delay was caused by the court). The absence of any reasonable justification for the plaintiff's attempt to inject new alternative theories of recovery at this stage in the case indicates that the amendment of the complaint has been unduly delayed. [FN1] This unexplainable delay does not weigh in favor of granting the plaintiff's request for leave to amend. *See* J. Moore, 3 Moore's Federal Practice, ¶ 15.05, 15-93-4 (1978).

*4 Another factor which militates against granting leave to amend in this case is the fact that the plaintiff's motion to amend was filed more than two months after the defendant moved for summary judgment. One of the defendant's arguments in support of its motion involves the six-month statute of limitations under Mass. Gen. Laws ch. 151B. *See* Defendant's Memorandum in Support of Motion for Summary Judgment at 4. The proposed amended complaint, however, includes counts of willful discrimination under the ADEA. Because the ADEA provides a three-year statute of limitation for willful violations, the allowance of the amended complaint might offset the limitations argument which has been directed at the plaintiff's original theory of recovery under Massachusetts law.

In a similar case, the First Circuit addressed the problem raised when leave to amend a complaint is sought in response to a motion for summary judgment. In *Carter v. Supermarkets General Corp.,* 684 F.2d 187 (1st Cir.1982), the plaintiff sought leave to amend her discrimination complaint in order to add a Title VII claim and a claim for willful discrimination under the Equal Pay Act after the defendant had moved for summary judgment. If the willfulness claim were allowed, the plaintiff would have benefited from a longer statute of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4

Not Reported in F.Supp., 1985 WL 48174 (D.Mass.)

**(Cite as: 1985 WL 48174 (D.Mass.))**

limitations. *Id.* at 189. The district court refused to grant leave to amend. The First Circuit agreed and viewed the plaintiff's belated attempt to amend her complaint in response to the defendant's motion for summary judgment as a valid reason for denying leave to amend. *Id.* at 192. *Citing Woodson v. Fulton,* 614 F.2d 940, 942-43 (4th Cir.1980) (denial of motion to amend was proper where made by plaintiff after defendant had moved for summary judgment and where plaintiff had known for some time of possible additional claim) and *Eisenmann* v. *Gould-National Batteries, Inc.,* 169 F.Supp. 862, 863-64 (E.D.Pa.1958).

The rationale for denying leave to amend the complaint when a summary judgment motion is pending was articulated succinctly in *Eisenmann* v. *Gould-National Batteries, Inc., supra.* In *Eisenmann,* the plaintiffs delayed for two years and waited until after their opponents summary judgment motion was pending before seeking leave to amend their complaint. In denying leave to amend, the district court ruled that "[t]he plaintiffs should not be permitted to sit by for this period of time and attempt to bolster up their pleadings in answer to a motion for summary judgment." *Id.* at 864 *citing County of Marin* v. *United States,* 150 F.Supp. 619, 623 (N.D.Cal.1957). *See also Freeman v. Continental Gin Co., supra,* 381 F.2d 459, 469.

This rationale applies with equal force to the case at bar. The plaintiff seeks to amend the complaint in the instant case more than two months after the defendant moved for summary judgment. Moreover, as in *Carter,* if the plaintiff's amendment were allowed, he could defeat the summary judgment motion by availing himself of the ADEA's three-year statute of limitations for willful violations. As the *Eisenmann* court recognized, a motion to amend the complaint at this stage in the case is not a proper response to a summary judgment motion. The plaintiff disregarded the ten day period for filing a response to the defendant's motion established by this Court's Scheduling Order and Local Rule 12. In addition, even though the plaintiff benefited from a lengthy extension, he ignored the deadline for filing a response stated in

this Court's February 25, 1985 Order. Given this trail of delay, the plaintiff, like the plaintiffs in *Carter* and *Eisenmann,* should not now be allowed to "bolster up" his pleadings in response to a timely filed motion for summary judgment.

**\*5** Finally, the defendant Company has argued that it will be prejudiced if leave to amend is granted. I agree. Depositions of the two principal individuals in this case have been completed. If the plaintiff's proposed claims of willful discrimination under the ADEA are allowed, however, a new round of depositions regarding the circumstances of the demotion will be necessary. In addition, the defendant is entitled to know whether the plaintiff has complied with the ADEA's jurisdictional prerequisites. *See* 29 U.S.C. § 626(d). Because the defendant was not aware that the plaintiff would seek relief under the ADEA at the time he was deposed, the Company did not have the opportunity to determine whether the ADEA's procedural pre-conditions to a civil action were fulfilled. Therefore, more deposition inquiry might also be necessary on this point.

The delay that would result if the plaintiff's complaint were amended and depositions reopened would be substantial. As the record indicates, this delay would exacerbate the unreasonable delay which has already occurred. *See Mende* v. *Dun & Bradstreet, Inc.,* 670 F.2d 129, 131 (9th Cir.1982) (denial of leave to amend upheld because among other reasons, "the court apparently believed there had been undue delay even before the plaintiff filed his amended complaint."). In sum, therefore, given the plaintiff's undue delay prior to his motion for leave to amend, the pendency of the defendant's motion for summary judgment and the prejudicial impact allowance of the amendment would have on the defendant, the plaintiff's motion for leave to amend the complaint is denied.

II.   THE  DEFENDANT'S  MOTION  FOR SUMMARY JUDGMENT

A. The Plaintiff's Claims for Breach of an Implied Covenant of Good Faith and Fair Dealing.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 5

Not Reported in F.Supp., 1985 WL 48174 (D.Mass.)

**(Cite as: 1985 WL 48174 (D.Mass.))**

The defendant has moved for summary judgment on Counts I and IV of the complaint. These counts assert claims for breach of an "implied covenant of good faith and fair dealing" between the plaintiff and the defendant. *See* Complaint at ¶¶ 8 and 15. According to the plaintiff, the defendant breached this covenant when it demoted him solely because of his age. *Id.*

Through Counts I and IV, the plaintiff seeks to avail himself of the cause of action which was recognized by the Supreme Judicial Court of Massachusetts in *Fortune* v. *National Cash Register Co.,* 373 Mass. 96 (1977). There is a serious question concerning whether the "public policy" cause of action created for a *terminated* employee at will in *Fortune* may be asserted by a *demoted* employee such as the plaintiff in the instant case. [FN2] Nevertheless, assuming the *Fortune* cause of action is available to a demoted employee, it is apparent that the theory may not be advanced by an employee demoted because of his age.

In *Crews v. Memorex Corp.,* 588 F.Supp. 27 (D.Mass.1984), Judge Tauro ruled that a common law claim under *Fortune* may not be maintained by a plaintiff alleging age discrimination. *Id.* at 29-30. The rationale employed by Judge Tauro included his belief that the "creation of a common law action based on the public policy against age discrimination would interfere with the comprehensive remedial scheme in Chapter 151B." *Id.* at 29. Accordingly, because "the creation of a common law action would allow an employee to bypass legislatively mandated prerequisites for judicial relief [in Mass.Gen.Laws ch. 151B]," Judge Tauro held that Massachusetts law does not allow a common law action for a discharge which allegedly violated the public policy against age discrimination. *Id.* at 29-30, *see id.* at 29 n. 4 *quoting Ferrante* v. *Western Electric Co.,* No. 81-3004-Z, slip op. at 7 (D.Mass. Apr. 29, 1983).

**\*6** I find the rationale employed by Judge Tauro in *Crews* persuasive. Moreover, I am convinced by a recent decision of the Massachusetts Appeals Court that Massachusetts law does not sanction a common law action for breach of an implied covenant of good faith because of age discrimination.

In *Meeley* v. *Gillette Corp.,* No. 84-499, slip op. (Mass.App.Ct. March 21, 1985), the appeals court ruled that a common law action under *Fortune* was not needed to enforce the public policy against age discrimination in Massachusetts. According to the court, "the public policy against age discrimination is already protected by a comprehensive legislative scheme, G.L. c. 151B." *Id.* at 2. Thus, the appeals court concluded that the danger of allowing interference with "the policies of G.L. c. 151B and the recent decisions of the Supreme Judicial Court which disfavor the creation of duplicative remedies suggest the remedy to be provided in [age discrimination] cases is the remedy of c. 151B." *Id.* at 5 (citations omitted).

Because the plaintiff in the case at bar has alleged that the defendant engaged in age discrimination, *Crews* and *Melley* command that a common law action for breach of an implied covenant of good faith may not be maintained under Massachusetts law. Accordingly, the defendant's motion for summary judgment on Counts I and IV is granted.

B.   The   Statute   of   Limitations   under *Mass.Gen.Laws ch. 151B*

The defendant has moved for summary judgment on Count II of the complaint. According to the defendant, the plaintiff's claim under Mass.Gen.Laws ch. 151B is barred by the applicable statute of limitations. Specifically, the defendant contends that the plaintiff did not file an age discrimination complaint with MCAD until more than six months after the date when his cause of action accrued.

The plaintiff commenced his action in the Massachusetts Superior Court on September 18, 1985. Section 9 of Chapter 151B authorizes the institution of a civil action against an employer "at the expiration of ninety days after the filing of a complaint with [MCAD]." Mass.Gen.Laws ch. 151B § 9. Section 5 of Chapter 151B governs the complaint procedure before the MCAD. According to section 5, "[a]ny complaint filed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 6

Not Reported in F.Supp., 1985 WL 48174 (D.Mass.)

**(Cite as: 1985 WL 48174 (D.Mass.))**

pursuant to this section must be so filed within six months after the alleged act of discrimination." Mass.Gen.Laws. ch. 151B § 5 (1983). In order for this action under Mass.Gen.Laws ch. 151B to be considered timely, therefore, the plaintiff in the instant case must have filed a complaint with the MCAD within six months of the defendant's act of discrimination. *See Davis v. Sears Roebuck & Co.,* 708 F.2d 862, 865 (1st Cir.1983); *Carter* v. *Supermarkets General Corp., supra,* 684 F.2d 187, 191; *Holden v. Massachusetts Commission Against Discrimination,* 671 F.2d 30, 32 (1st Cir.), *cert. denied,* 459 U.S. 843 (1982).

In *Delaware State College v. Ricks,* 449 U.S. 250 (1980), the Supreme Court addressed the issue of when the statute of limitations begins to run in an employment discrimination case. In *Ricks,* a professor maintained that he was discriminatorily denied tenure because of his race. The problem confronting the Court was to determine whether the statute of limitations started to run at the time Ricks was informed of the tenure denial, or when his employment actually terminated approximately one year later.

**\*7** The Supreme Court chose the former date. According to the Court, "the only alleged discrimination occurred--and the filing limitations periods therefore commenced--at the time the tenure decision was made and communicated to Ricks. This is so even though the *effects* of the denial of tenure--the eventual loss of a teaching position--did not occur until later." *Id.* at 258 (emphasis in original). The Court further reasoned, " '[t]he proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences* of the acts become painful.' " *Id. quoting Abramson* v. *Unversity of Hawaii,* 594 F.2d 202, 209 (9th Cir.1979) (emphasis supplied by the Supreme Court).

In the instant case, therefore, under *Ricks,* the plaintiff must have filed a complaint with the MCAD within six months of the time when the decision to demote was communicated to him, not when the demotion actually occurred. *See Holden v. Commission Against Discrimination, supra,* 671

F.2d 30, 34. The plaintiff contends that there is a genuine issue of material fact concerning the date upon which the limitations period began to run. According to the plaintiff, the statute of limitations began to run at the earliest on December 30, 1982. On that day, the plaintiff received a written "official notice" that his demotion would take effect on January 1, 1983. Because the plaintiff filed his complaint with the MCAD on June 27, 1983, he maintains that the instant action is not barred by the statute of limitations.

The defendant, on the other hand, contends that the statute of limitations began to run on December 1, 1982. On that day, the defendant argues the undisputed facts indicate that the plaintiff was told by John Alexander that he would be demoted. Citing *Ricks,* the defendant believes that the plaintiff's age discrimination complaint was filed with the MCAD after the expiration of the six-month limitations period set forth in Mass.Gen.Laws ch. 151B.

 The record supports the defendant's argument. The plaintiff's own testimony at his deposition indicates that he was informed on December 1, 1982 by his Supervisor, John Alexander, that he would be demoted. For example, the plaintiff testified at one point:

(Mr. Moss) Q Now on December 1, 1982, you had another conversation with John Alexander?

(Plaintiff) Yes.

Q This started in the Worcester sales office and later went down into his car; is that correct?

A. Correct.

Q. And at that time, he told you "Vinnie, I'm going to demote you"?

A. Right.

Q. Effective January 1st?

A. Right.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 7

Not Reported in F.Supp., 1985 WL 48174 (D.Mass.)

**(Cite as: 1985 WL 48174 (D.Mass.))**

Plaintiff's Deposition at 94. *See also id.* at 105-07, 111, 118, 181-82. John Alexander also testified in his deposition that he informed the plaintiff that he would be demoted on December 1, 1982. *See* Alexander Deposition at 30, 35, 50-56. Therefore, despite the plaintiff's insistence that an issue of fact exists, given the record before me, I do not see how a reasonable juror could conclude that the plaintiff was not informed of his demotion on December 1, 1982.

**\*8** Because the plaintiff was informed of his demotion on December 1, 1982, the statute of limitations under Mass.Gen.Laws ch. 151B began running on that date. The analogy to *Ricks* and a subsequent Supreme Court case, *Cardon v. Fernandez,* 454 U.S. 6 (1981) (per curiam) is clear. In those discrimination cases, the Supreme Court ruled that the statute of limitations began to run when the employer's decision was communicated to the employee. In *Ricks* and *Chardon* the Court found that "the operative decision was made--and notice given--in advance of a designated date on which the employment terminated." *Chardon, supra,* 454 U.S. 6, 8. Similarly, in the instant case, the operative decision to demote the plaintiff was conveyed to him on December 1, 1982. Indeed, the plaintiff began in intra-company fight to reverse that decision on that day. *See* Plaintiff's Deposition at 105-107, 181-82.

Accordingly, since the undisputed facts establish that the defendant's decision to demote the plaintiff was communicated to him on December 1, 1982, the statute of limitations under Chapter 151B began to run on that day. *Compare Connolly v. United States Postal Service,* 579 F.Supp. 305, 308 (D.Mass.1984) ("I find that the record of this case proves that the Postal Service's decision to remove the plaintiff was communicated to him by June 15, 1981 at the latest. Consequently, the thirty day filing period [under EEOC regulations] began to run on that day.").

In sum, therefore, Count II is not timely unless the plaintiff filed his age discrimination complaint with the MCAD within six months of December 1, 1982. The record indicates that the complaint was not filed until June 27, 1983. This was more than six months after the alleged act of discrimination. Under Mass.Gen.Laws ch. 151B, therefore, Count II is time barred. Accordingly, the defendant's motion for summary judgment on Count II is granted.

*Conclusion*

In sum, the plaintiff's motion for leave to amend the complaint is denied. The defendant's motion for summary judgment on Counts I, II and IV is granted. Count III of the complaint having been stricken by Order of this Court on November 7, 1984, the case is dismissed in its entirety.

Finally, the defendant has moved for costs and attorney's fees pursuant to Mass.Gen.Laws ch. 231 § 6F and Fed.R.Civ.P. 11. The defendant believes that these sanctions should be assessed for several reasons including the plaintiff's assertion of damage claims for emotional distress, his attempt to add an alternative theory of recovery based on no new facts at an advanced state of the case and the plaintiff's disregard for the deadlines established by this Court.

Although these issues, especially the plaintiff's indifference towards Local Rule 12 and his unexcused failure to heed the final extension order dated February 25, 1985, causes this Court great concern, I do not choose to assess costs and fees.

SO ORDERED.

*JUDGMENT*

In accordance with the Court's memorandum and order dated June 7, 1985 denying plaintiff's motion to amend the complaint and granting the defendant's motion for summary judgment on Counts I, II and IV and Count III of the complaint having been stricken by Order of this Court on November 7, 1984, it is hereby ORDERED

**\*9** Judgment for the defendant. Complaint dismissed.

> FN1. It is possible that the plaintiff misconceived the scope of the ADEA or was unsure of the Act's availability.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 8

Not Reported in F.Supp., 1985 WL 48174 (D.Mass.)

**(Cite as: 1985 WL 48174 (D.Mass.))**

Misconception of pertinent law, however, is not a valid justification for a belated attempt to amend a pleading in order to assert an alternative theory of recovery. *See Vargas v. McNamara,* 608 F.2d 15, 19 (1st Cir.1979) and *Troxel v. Schwinn Bicycle Co., supra,* 489 F.2d 968, 971.

FN2. In *McCone v. New England Telephone & Telegraph Co.,* 393 Mass. 231 (1984), the Supreme Judicial Court stated:
The plaintiffs also argue that the company can be held liable for breach of the implied covenant even if it did not terminate the employees, either actually or constructively. The plaintiffs cite no cases to support this proposition, and we know of none in this State. Our cases have held employers liable for breach of the implied covenant of good faith and fair dealing only when they have terminated an employee.
*Id.* at 233-34 n. 7 *citing Fortune v. National Cash Register Co., supra, Gram v. Liberty Mutual Ins. Co.,* 384 Mass. 659 (1981) (Gram I); and *Maddaloni v. Western Mass. Bus Lines, Inc.,* 386 Mass. 877 (1982).

Not Reported in F.Supp., 1985 WL 48174 (D.Mass.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in N.E.2d                                                         Page 1

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

C

Superior Court of Massachusetts.
WILLIAM GALLAGHER ASSOCIATES
INSURANCE BROKERS, INC.,
v.
Albert EVERTS, II et al. [FN1]

> FN1. Intercontinental Insurance Brokers,
> LLC.

No. 199900519C.

Sept. 6, 2001.

MEMORANDUM OF DECISION AND ORDER
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

MARGAROT R. HINKLE, Justice of the Superior
Court.

*1 Plaintiff William Gallagher Associates
Insurance Brokers, Inc. seeks damages and
injunctive relief from defendants Albert Everts, II
and InterContinental Insurance Brokers, LLC
("InterContinental"). Plaintiff claims defendants
misappropriated confidential business information
and trade secrets and solicited plaintiff's customers.
[FN2] The matter is now before the court on
defendants' motion for summary judgment. After a
hearing, for the reasons set forth below, this motion
is *ALLOWED.*

> FN2. Count I of the First Amended
> Complaint alleges breach of contract by
> Everts. Count II seeks specific
> performance. Count III alleges breach of
> the implied covenant of good faith and fair
> dealing. Count IV alleges that
> InterContinental intentionally interfered
> with plaintiff's contractual relations. Count
> V alleges that Everts convened plaintiff's
> confidential information and trade secrets

for his own benefit. Count VI alleges that
Everts intentionally interfered with
plaintiff's advantageous relationships with
its customers. Count VII alleges that
Everts and InterContinental convened and
misappropriated plaintiff's trade secrets.
Count VIII alleges violation of G.L.c. 93A,
§§ 2 and 11 by Everts and InterContinental.

BACKGROUND
The undisputed material facts as established by the
summary judgment record are as follows. [FN3]

> FN3. The original complaint was verified.
> The first amended complaint is not
> verified. Because plaintiff relies upon
> factual allegations contained in the verified
> complaint in opposition to defendants'
> motion, I too rely upon the verified
> complaint for such facts. Citations to the
> complaint are to the original, verified
> complaint.

Everts began working for Frank B. Hall & Co. of
Boston ("Hall & Co.") in or around 1985. At Hall &
Co., Everts was an account manager. [FN4] In this
capacity, he did not sell insurance but issued
certificates of insurance, sent out policies and made
proposals. The nature of Everts' work as an account
manager was generally the same as the work of a
"producer" but differed in that a producer is
ultimately responsible for the accounts. [FN5]
Everts performed work for two clients of Hall &
Co. while there, Sasaki Associates and Envirogen.

> FN4. There is a discrepancy in the record
> as to whether Everts was ever a producer
> at Hall & Co. In his affidavit, Everts states
> he was a producer in or about 1988. In his
> deposition testimony, he states he was an
> account manager at Hall & Co., and was
> not a producer there. Everts' precise role at
> Hall & Co. does not affect my result.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                     Page 2

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

FN5. Everts' supervisor at Hall & Co. was a producer.

Everts was involved in the environmental and professional liability insurance business at Hall & Co. Everts provided insurance and risk management services for environmental and professional liability risks. He would consult with clients and prospective clients concerning their insurance and then receive quotes from insurance companies for the clients. Everts also generated insurance manuscript and policy forms.

The potential market for environmental insurance and professional liability products includes hospitals, landfills, industry, manufacturing, laboratories, dry cleaners, automobile repair shops, junkyards, restaurants, supermarkets, shopping malls, gas stations, apartment buildings, farms and entities buying commercial properties. The insurance product Everts sold to such clients and the insurers providing that insurance product are well known in the industry. Everts was not in any special position to receive the quotes he obtained, because they are available to anyone with the relevant information about the client or potential client. [FN6]

FN6. Plaintiff denies this fact, which is taken from Everts' affidavit. However, plaintiff offers no evidence contradicting this assertion.

In 1992, Everts moved to California and worked as a producer for the Crowell Insurance Agency of Orange County. After leaving that agency, Everts worked for Marsh & McLennan in 1993 for several months as a producer. Everts maintained contact with Sasaki Associates and Envirogen. [FN7]

FN7. Plaintiff disputes that Everts maintained a relationship with Sasaki Associates and Envirogen. Everts did not write business for either of those firms during this time, for jurisdictional reasons. As to Sasaki Associates, Everts maintained a friendly relationship with its principals, which included golf games. At one such

game, Sasaki Associates' chief operating officer stated "we need to do business with you again."

In August 1993, Everts became a producer with Minet Insurance Services, Inc., a subsidiary of Minet, Inc., and worked in Los Angeles. Everts believes that at that time he required no additional training to work as a producer. He did, however, take courses to maintain his license as a property casualty broker.

Upon joining Minet Insurance Services, Inc., Everts signed a restrictive covenant agreement (the "1993 agreement") [FN8] with Minet International Professional Indemnity Brokers, Inc. (a sister corporation of Minet Insurance Services, Inc.). [FN9] Only Everts' signature appears on the 1993 agreement; this agreement was not signed by any representative of Minet Insurance Services. At the time Everts signed the 1993 agreement, Mike Newman, Senior Vice President of Minet Insurance Services, Inc., told Everts that this agreement would never be enforced by Minet Insurance Services, Inc., because non-competition agreements are unenforceable in California. [FN10]

FN8. This 1993 agreement provides in substance: Everts' employment is contingent on assent to the provisions of the agreement. Everts acknowledges that he will obtain knowledge of secret and confidential information belonging to Minet. Upon termination of employment, Everts will return to Minet all written data and information concerning its business including customer lists, data and information about customers, sources of business, markets for placement of business, sales materials, business forms and records and relationships and arrangements with insurers. Everts further agrees that he will not directly or indirectly use or divulge any secret or confidential information for two years after termination of employment.

Paragraph five states in full:
For a period of two (2) years after

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                    Page 3

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

termination of employment, Employee shall not either directly or indirectly, on Employee's own behalf or on behalf of any other business, do any business with, solicit any business from or contact any person, firm or corporation which was a customer or client of Minet during Employee's tenure or which Minet was attempting to obtain as an account during the six (6) months immediately preceding termination of employment.

FN9. The parties agree that Everts was not employed by Minet International Professional Indemnity Brokers, Inc. However, that corporation is the other party to the 1993 agreement. While Everts knew that Minet Insurance Services, Inc. had a number of corporate relatives, he did not attach any significance to the corporation named in the 1993 agreement. Everts testified that his letter offering employment came in the name of Minet Insurance Services, Inc. Everts also testified that when he got the 1993 agreement, he did not take note of the name because he had been told by persons at Minet Insurance Services, Inc. that the agreement was unenforceable.

FN10. Minet Insurance Services, Inc. is a California-based corporation, and Everts signed the 1993 agreement in California. Plaintiff neither admits nor denies the statement by Newman (which, given the relationship between Minet Insurance Systems, Inc. and the plaintiff, I take as an admission). Plaintiff refers to nothing in the record contradicting this statement.

**\*2** In or around February 1996, Minet, Inc. sent Everts (in California) an offer letter [FN11] and another restrictive covenant agreement (the "1996 agreement"). Everts signed the 1996 agreement and sent it to Minet, Inc. in New York. The 1996 agreement provided a signature line for a representative of the William Gallagher Associates Insurance Agency, Inc. That company, a

Massachusetts corporation, was owned by Minet, Inc., and changed its name to Minet Insurance Brokers, Inc. in 1996. Through a series of sales and name changes, William Gallagher Associates Insurance Agency, Inc. and Minet Insurance Brokers, Inc. became the plaintiff in this action. [FN12] No representative of Minet, Inc. or the William Gallagher Associates Insurance Agency, Inc. signed the 1996 agreement.

FN11. The offer letter, dated February 6, 1996, states in relevant pan:
Dear Al,
We are pleased to offer you a position as Assistant Vice President in the Energy, Mining and Construction Unit located in Boston, Massachusetts [sic]. Your start date will be on or around April 1, 1996 ... Your relocation from Los Angeles to Boston will be paid by Minet.
Attached please find revised Mutual Recital Agreements (Massachusetts [sic] version). Prior to starting the relocation process, please return the accepted offer of employment letter and executed Mutual Recital Agreements ... Relocation will be contingent upon receipt of these completed forms.
Employment with the company is on an "at-will" basis and is not for a stated period of time. This letter represents our complete mutual understanding of the terms of the job offer. Once again, we are enthusiastic about offering you employment at Minet, Boston. Should you accept this offer of employment, please sign below and return it to the Human Resources Department in New York.

FN12. For clarity, I set forth the corporate sales and name changes as they appear in the record:
1. William Gallagher Associates Insurance Agency, Inc. incorporated in Massachusetts in April 1983 and changed its name to Minet Insurance Brokers, Inc. by articles of amendment filed February 1, 1996. Minet Insurance Brokers, Inc. was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                    Page 4

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

owned by Minet, Inc., a New Jersey corporation. Minet, Inc. operated through various subsidiaries, including Minet International Professional Indemnity Brokers, Inc. Minet, Inc., in turn, was a subsidiary of the ultimate corporate parent, St. Paul Insurance Co.

2. On or about May 21, 1997, Minet, Inc. was sold to Aon Corp.

3. Philip J. Edmundson and William Gallagher purchased the stock of Minet Insurance Brokers, Inc. in 1997. 4. By articles of amendment filed October 1, 1997, Minet Insurance Brokers, Inc. changed its name to William Gallagher Associates Insurance Brokers, Inc., which is the name under which plaintiff filed this action.

The offer letter stated that Everts' relocation to Boston would be contingent on receipt of the completed 1996 agreement. The 1996 agreement, nine pages in length, states that it is an agreement between Everts and William Gallagher Associates Insurance Agency, Inc. and its parents, subsidiaries, successors, affiliates and assigns. [FN13] The space provided for the date of the agreement is left blank. The agreement contains "mutual recitals." [FN14]

FN13. For clarity, I refer to the second party as plaintiff.

FN14. The 1996 agreement states in relevant part:
[Plaintiff] is engaged in the business of insurance and reinsurance brokerage, risk management and risk consulting services ("The Business"), including the solicitation and servicing of the insurance, insurance-related and risk financing needs of corporations, professional service firms and partnerships, associations, and individual clients ..., both nationally and worldwide ... [Plaintiff] devotes substantial resources to identifying the needs of and to developing and maintaining relationships with existing and prospective clients. These clients constitute a substantial part

of the goodwill of [plaintiff's] business. While these existing and prospective clients may be secured and/or serviced by [plaintiff's] employees, they remain at all times clients and prospective clients of [plaintiff]. In servicing [plaintiff's] existing and prospective clients, among other things, [plaintiff] makes available to its employees specially developed and researched insurance industry data and client-specific information, as well as an extensive network of support services.

During the course of employment with [plaintiff], employees receive and have access to proprietary and confidential information of [plaintiff], including but not limited to, information relating to [plaintiff's] clients, and their risk financing needs and characteristics, insurance markets for large or unusual commercial risks, [plaintiff's] own operations, market development, insurance and risk management requirements, and the conduct of [plaintiff's] affairs. Said data and information, not generally known in the relevant industry, constitute valuable assets to [plaintiff]. Through training and development, and access to proprietary and confidential information provided by [plaintiff], [plaintiff's] employees develop a unique set of skills and knowledge which enhances their effectiveness in The Business. Accordingly, the undersigned Employee is willing to enter into the covenants set forth herein in order to provide [plaintiff] with reasonable protection for its proprietary and confidential interest. Employee further acknowledges that it is reasonable to protect [plaintiff] against solicitation activities by the Employee for a limited period of time after Employee's termination of employment with [plaintiff] to enable [plaintiff] to gain the benefit of its investment in the development of its business relationships with its clients ...
Section one states:
(a) Employee shall not, either directly or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                    Page 5

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

indirectly, whether during or subsequent to employment, and except as may be required in the course of employment by [plaintiff], disclose, publish or communicate to any person or entity, or otherwise use for Employee's own benefit, or for the benefit of any other person or entity other than [plaintiff], any trade secret, proprietary and/or confidential information and materials relating to The Business which Employee learns while employed by [plaintiff] or to which Employee gains access during the course of employment with [plaintiff]. Employee shall, during the course of employment with [plaintiff], use best efforts to prevent the unauthorized publication or misuse of any trade secret, proprietary and/or confidential information and materials of [plaintiff].

(b) All notes, memoranda, records, files, drawings, tapes, disks, documents (including machine-readable documents), equipment and other material relating in any way to any trade secret, proprietary and/or confidential information and materials of [plaintiff] or any of its clients shall be and remain the sole and exclusive property of [plaintiff].

(c) During and after employment, Employee will not remove or cause to be removed from [plaintiff's] premises any trade secret, proprietary and/or confidential information and materials for purposes other than authorized work Employee performs and/or performed for [plaintiff]. Upon termination of employment, Employee agrees not to retain, but to return to [plaintiff], all trade secret, proprietary and/or confidential information and materials. Prior to termination of employment, Employee agrees to participate in an exit interview, at which time Employee may be asked to certify in writing under oath that Employee has complied with Employee's obligation to [plaintiff] hereunder and has returned to [plaintiff] all trade secrets, proprietary

and/or confidential information and materials belonging to [plaintiff]. At or prior to such exit interview (or at a later date if such information is not known at the time of such interview) Employee agrees to provide [plaintiff] advance written notice, indicating for whom Employee will work and in what capacity, after leaving [plaintiff's] employ. [Plaintiff's] failure to conduct an exit interview for any reason shall not constitute a waiver of any of the provisions of this Agreement. (d) The terms trade secret, proprietary and/or confidential information and materials are to be construed as broadly as possible. Without prejudice to the generality of Section 1 of this Agreement, the following is a non-exhaustive list of matters which, in relation to [plaintiff], are acknowledged by Employee to constitute trade secrets, proprietary and/or confidential information and materials and must be treated as such by Employee: (i) any trade secrets of [plaintiff]; (ii) client and prospective client lists (including insurance programs, renewal dates, coverages and other information); (iii) all data, records, documents, specifications, computer programs, listings, disks, tapes, systems, documentation and manuals, processes, methods and intangible rights which are either developed by the Employee during the course of employment with [plaintiff] or to which the Employee has access during the course of employment; (iv) relationships and arrangements with insurers, reinsurers, retail and wholesale brokers, associations and other financial services institutions; (v) information which has been supplied in confidence by clients, correspondents or agents; (vi) professional advice taken by [plaintiff]; (vii) marketing strategies and plans, and products developed by plaintiff; and (viii) any other information made available to the Employee which is identified to the Employee as being of a confidential

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                      Page 6

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

nature.

Section two provides in relevant part: (a) Employee agrees that, during Employee's employment with [plaintiff] and for a period of twelve (12) calendar months following termination of employment with [plaintiff], Employee will not, directly or indirectly, call upon, canvass, solicit, or approach, or cause to be called upon, canvassed, solicited or approached, any client of [plaintiff] on whose accounts Employee worked, for the purposes of soliciting and/or providing to such client the type of business placed by such client through [plaintiff and/or the type of business placed by such client by plaintiff]. Clients on whose accounts Employee worked shall include only those clients for whom Employee placed business, facilitated the placement of business, or provided services in The Business, or clients whose business, [sic] was placed or serviced, or for whom services in The Business were provided, by employees who Employee supervised within the twenty-four (24) month period prior to termination of Employee's employment with [plaintiff].

(b) Employee further agrees that during Employee's employment with [plaintiff] and for a period of twelve (12) calendar months following termination of employment with [plaintiff], Employee will not call upon, canvass, solicit or approach or cause to be called upon, canvassed, solicited or approached, any person or entity which has been called upon or solicited (or to which [plaintiff] has submitted any proposal for the provision of services in The Business) within the six (6) calendar month period prior to the termination of Employee's employment with [plaintiff]. Any person or entity which has been called upon or solicited or to which [plaintiff] has submitted any proposal for the provision of services in The Business shall include only those persons or entities whose business

Employee sought, negotiated for or attempted to provide services in The Business or whose business was sought, negotiated for or an attempt to provide services in The Business was made by employees whom Employee supervised within the six (6) month period prior to termination of Employee's employment with [plaintiff].

Section three provides in full:

Employee agrees that at all times during Employee's employment relationship with [plaintiff], Employee shall not, directly or indirectly, render competing services in The Business for the Employee's own behalf or on behalf of any other person or entity. Employee also agrees that while Employee is employed by [plaintiff], Employee will not undertake the planning or organization of any business activity competitive with the duties performed for [plaintiff] or engage in any other activity which interferes, directly or indirectly, with Employee's duties for and responsibilities to [plaintiff].

Section four states that the employee agrees for 12 months following termination to provide the prospective new employer with a copy of the 1996 agreement and allows plaintiff to do the same. Section five states that the employee agrees that plaintiff is entitled to injunctive relief against the employee for any breach or prospective breach of the agreement without posting a bond. The employee also agrees to pay expenses and reasonable attorneys fees plaintiff incurs to enforce the agreement. Section six contains a choice of law provision (choosing Massachusetts law). Section seven contains miscellaneous provisions: waiver of a term or condition does not indicate waiver of other rights; the agreement is enforceable by Minet's successors; required notices are to be delivered according to specifications in the agreement; a severability clause is included and the agreement states it is the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                          Page 7

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

full understanding of the parties regarding non-disclosure, non-solicitation and non-competition by the employee. The final page of the agreement contains only the places for the parties' signatures and, as noted above, only Everts' signature appears.

In April 1996, Everts worked as a producer in the Boston office of Minet Insurance Brokers, Inc. The cost of Everts' move to Boston was covered by St. Paul Insurance Co. [FN15] Approximately one year later, in May 1997, Minet Insurance Brokers, Inc. (by way of its ownership by Minet, Inc.) was sold to Aon Corporation. In August 1997, the management of the Boston office reacquired ownership of the office, and renamed it William Gallagher Associates Insurance Brokers, Inc. See *supra* n. 12. While Everts was aware of these corporate purchases and name changes, he was not informed of specific details regarding those transactions or their impact on Everts' employment contracts. When he began working for Minet Insurance Services, Inc., Everts was aware that that corporation was one of a number of related corporations, but he did not know the exact corporate relationship.

> FN15. It is unclear precisely what costs were covered. The only relevant evidence the parties have referred to is that St. Paul paid Everts' airfare when he flew to Boston to find an apartment. The amount St. Paul paid is not disclosed.

Working for Minet Insurance Brokers, Inc. and then for the plaintiff, Everts provided insurance and risk management services for environmental and professional liability risks. He consulted with clients and prospective clients concerning their insurance and obtained insurance quotes from insurance companies for the clients. The quotes he received were obtainable by any person with the relevant information from the client. Everts also generated insurance manuscript and policy forms. The skills Everts used to perform these functions were skills that he acquired before working for plaintiff or plaintiff's predecessors, but he was still required to attend courses to maintain his license.

The duties Everts performed were generally the same in Boston as they were in California.

Everts received some necessary assistance in performing his job with plaintiff (and Minet Insurance Brokers, Inc.). Specifically, Everts received assistance from persons in the typing pool (although he did much of his own typing), from account managers who performed necessary clerical tasks for Everts and from other support staff members. [FN16] Everts' office supplies were provided by the company. Everts also received assistance from Philip Edmundson, who brought Everts with him to sell insurance to Instron Corporation. Everts and Edmundson were successful in selling environmental insurance to Instron. However, Everts has had no contact with Instron since he left his employment with plaintiff, and Instron Corporation has never become a client of InterContinental. Edmundson also accompanied Everts on a visit to a representative of Bank of Boston, but this visit did not generate any business for plaintiff, and there is no evidence Bank of Boston ever became a client of InterContinental. In addition, Everts was accompanied by a young assistant on client visits on four or five occasions, but Everts is unaware of any instance in which the assistant's presence substantially helped to create a customer relationship, and plaintiff offers no evidence to contradict this. Finally, one newsletter was sent to clients and potential environmental clients by plaintiff as a marketing tool. Everts wrote this newsletter. Everts is unaware of any instance in which the newsletter helped him obtain business, and there is no evidence that the newsletter played any role in generating any business.

> FN16. In the portions of the Everts deposition to which the parties have referred there appears to be some difference in the function of account managers. When describing his responsibilities as an account manager at Hall & Co. in 1985, Everts testified that he performed many of the functions of a producer and that the principal difference between his job responsibilities and those of a producer were that the producer was a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                    Page 8

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

supervisor who was ultimately responsible for the accounts. Everts Dep. at 21-22. Later in the same deposition Everts testified that the account managers working for him (when he was a producer) performed clerical tasks such as issuing certificates of insurance. Everts Dep. at 170-74. As to this latter deposition testimony, Everts first terms his assistants "customer service reps" and then calls them account managers. Everts Dep. at 170-72. While it may be the case that account managers at Hall & Co. performed different functions than those working for plaintiff, it is not my role now to make factual determinations. I simply note that Everts' testimony is not necessarily contradictory and, more significantly, plaintiff has not pointed to any evidence to indicate that its account managers performed "producer-like" functions.

**\*3** While working for plaintiff and Minet Insurance Brokers, Inc., Everts attended a Miller Heiman sales training program. Plaintiff paid for Everts to attend that program. [FN17] Everts had attended three other Miller Heiman sales training programs with previous employers, beginning in or about 1990. [FN18] This training program, along with the courses to maintain his license, are the only evidence before me of training of Everts while working for Minet Insurance Brokers, Inc. and plaintiff.

>      FN17. Neither party refers to evidence regarding the location of the program, the cost of attendance and whether travel costs (if any) were paid by plaintiff.

>      FN18. Everts does not indicate whether those other employers paid for his attendance.

Everts does not recall any verbal or written statements being given to him regarding what type of client information should be kept confidential. No instruction was given to Everts as to how to keep information confidential. Plaintiff provided

Everts with a laptop which Everts believes (and plaintiff has not contradicted this belief) encouraged Everts to bring client information, documents and files outside the office. Everts was never instructed not to create a customer list. To Everts' knowledge, no documents relating to clients or to services provided to clients were marked "confidential" or "trade secret or contained any other mark requiring confidentiality. Because they were not locked, files were accessible to any person in the office including support personnel, The office was not partitioned to prevent other nonessential personnel from viewing the documents.

Everts received a base salary from plaintiff and had the potential to receive a bonus based upon new business brought in.

Everts left plaintiff in November 1998 because he did not believe plaintiff was adequately servicing the clients whose accounts Everts handled and because he was "rendered invisible," by which Everts means that he was excluded from a sales incentive program whereby commissions were earned and was not offered an equity position or given raises in pay. [FN19]

>      FN19. Plaintiff disputes that Everts left because he felt plaintiff was not adequately servicing clients. Plaintiff argues that this is vague and susceptible to multiple interpretations. Everts' deposition testimony makes clear that he felt that there were too few customer service representatives (or account managers) and too rapid turnover of the same. According to Everts' testimony, this was a problem because Everts was forced to perform the functions of the account managers and had to train other account managers, which reduced the time Everts was able to sell insurance and earn money.

On November 5, 1998, Everts accepted InterContinental's offer of employment as a producer. Everts submitted his resignation to plaintiff in a memorandum dated November 13, 1998.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

Everts informed some of the clients whose accounts he handled that he would be leaving employment with plaintiff. Everts did not urge these customers to leave plaintiff or solicit them to transfer their policies to InterContinental. Everts did not disparage plaintiff or state that InterContinental would be a better agency. Some customers told Everts that they wanted to continue doing business with him.

After leaving plaintiff's employ, Everts did not utilize any customer list of plaintiff to solicit clients. Everts did not consult such a list to generate potential customers. Everts did not generate a list of clients whose accounts he serviced working for plaintiff, either before or after leaving plaintiff's employ. Everts remembered the clients whose accounts he serviced while in plaintiff's employ. This consisted of approximately 25 customers. Everts had had experience with most of these customers for many years.

**\*4** However, Everts did take a memorandum from plaintiff to various employees, dated November 9, 1998, regarding potential minimum revenue requirements. Attached to this memorandum was a list of approximately 200 client accounts. The memorandum states that these accounts generate less than $5,000 in revenue. According to the memorandum, in most cases the revenues generated by those accounts "do not compensate for the work/service provided" by plaintiff's staff. In addition, the memorandum states:

  Please review the list with the understanding that *it is very possible* that we will be implementing minimum revenue requirements for all future business as well as existing accounts as they approach renewal. Understand that *no such decision* has been made to date, but serious consideration will be given to the idea over the next few days/weeks. I would like you to pay particular attention to any account that has been on the books for 3 years or more which has shown no discernible growth or potential for growth. We may require that these accounts be assessed a fee or that they find another broker (in a nice way, of course!).

(Emphasis in original.) Everts does not make any

money on accounts of $5,000 or less.

When he joined InterContinental, 13 of the clients whose accounts he had serviced working for plaintiff elected to continue their business relationship with Everts, terminating all or substantially all of their business relationship with plaintiff. Everts brought two of these clients, Sasaki Associates and Envirogen, to Minet Insurance Services, Inc. in 1993 and 1994. [FN20] Everts had developed social relationships with some of the principals of these two companies, who played golf with Everts and attended Everts' wedding in 1998. Four clients whose accounts Everts serviced, Acme Solvents, Midco Remedial Corp., Organic Chemicals and Verona Well Field, became clients while Everts was with Minet Insurance Services, Inc. in California. The remaining seven were clients whose accounts Everts serviced while he was a producer in the Boston office.

  FN20. Plaintiff denies that Everts "brought" these two clients to Minet Insurance Services, Inc. However plaintiff offers no contrary evidence.

Everts does not believe he has brought any former customers of plaintiff to InterContinental, other than clients whose accounts Everts personally serviced. [FN21] Plaintiff has offered no evidence to contradict this belief. At Everts' suggestion, both Sasaki Associates and Envirogen have kept some accounts with plaintiff, including Sasaki's employee benefits policies and Envirogen's directors and officers policies. The insurance Everts writes for these 13 companies is "fairly similar" to the insurance he wrote when working for plaintiff.

  FN21. In his deposition, Everts testified:
  There were some customers who I developed a long-term relationship with that I had a responsibility to let them know that I had left ... A lot of these small firms don't have insurance staff. They relied on me for a lot of their risk management decisions ... These are people who I had a personal relationship with. These are people who I've known for a very long

Not Reported in N.E.2d                                                                    Page 10

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)
**(Cite as: 2001 WL 1334763 (Mass.Super.))**

time. These are people who relied greatly on me for their business.
Everts Dep. at 77-78. When Everts told Joe Silvestri at Envirogen that he was leaving plaintiff, Silvestri responded by stating, "We're coming with you," and, "We don't make a move without you." Everts Dep. at 95-96.

When he informed these clients that he was with InterContinental, Everts did not use any specific, insider information as to whether the customers were susceptible to changing agencies (e.g., pending proposals or expiration data premium amounts). Everts only called persons within those companies and informed them he had left plaintiff's employ. [FN22]

> FN22. Everts called representatives of the companies, told the representatives that he was leaving plaintiff and told the representatives how to reach him at InterContinental. The companies' representatives asked Everts how they could continue doing business through Everts.

**\*5** With one exception, Everts personally solicited each of the clients who went with him to InterContinental. Those companies did not become clients through any document, referral or other resource provided by plaintiff. The exception is Environmental Project Control, which was a house account of plaintiff assigned to Everts.

After leaving plaintiff, Everts did not contact or solicit GEI consultants, Enventures Capital or Glendale Environmental. To Everts' knowledge (uncontradicted by plaintiff), none of those companies became customers of or were contacted by InterContinental. These accounts were not "parked" at another broker, in that Everts does not now receive commissions or benefits from these accounts and has not since leaving plaintiff. In addition, Everts has no arrangement to receive benefits from these accounts in the future. He does not know what agency these companies may have gone to, if they left plaintiff. He also does not know

who, if anyone, has been receiving commissions.

The names of some of plaintiff's customers appear on plaintiff's Internet Web site.

In August 1998, before Everts left employment with plaintiff, plaintiff asked Everts and the other producers to sign a 13-page restrictive covenant/non-compete agreement. Everts received a number of voice messages from Philip Edmundson requesting that he sign the agreement. Everts did not sign the agreement. In or around September 1998, Everts asked Patricia Arsenault (an employee of plaintiff) for copies of any restrictive covenant governing Everts. Arsenault provided Everts with a copy of the 1993 agreement, noting that it was the only such document in the file and had not been signed by the company.

At the time Everts accepted employment with InterContinental, he did not believe he was subject to any restrictive covenant or noncompete agreement. When it hired Everts, InterContinental did not believe Everts was subject to an enforceable restrictive covenant or noncompete agreement with a prior employer.

At InterContinental, Everts continues to place insurance with California-based insurers, and he also currently has customers based in California.

There is no evidence before me that InterContinental has sought from Everts confidential information relating to customers of plaintiff.

After Everts left, plaintiff, through its attorneys, wrote a letter to Everts and a letter to InterContinental, alleging that Everts was in violation of the 1993 agreement.

## DISCUSSION

Summary judgment is appropriate where there are no genuine issues of material fact and the summary judgment record entitles the moving party to judgment as a matter of law. *Cassesso v. Commissioner of Correction,* 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                 Page 11

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. *Pederson v. Time, Inc.,* 404 Mass. 14, 17 (1989). On matters for which the moving party does not bear the burden of proof at trial, it may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party's case or by showing that the moving party has no reasonable expectation of proving an essential element of its case at trial. *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the non-moving party must allege specific facts establishing the existence of a genuine issue of material fact and cannot defeat the motion by resting on mere assertions of disputed facts. *LaLonde v. Eissner,* 405 Mass. 207, 209 (1989). In deciding a motion for summary judgment, the court may consider pleadings, depositions, answers to interrogatories, admissions on file and affidavits. *Community Nat'l Bank v. Dawes,* 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The court may only consider undisputed material facts and apply them to the law. See *Kelley v.. Rossi,* 395 Mass. 659, 663 (1985).

*I. BREACH OF CONTRACT*

**\*6** Plaintiff alleges that Everts breached the 1996 agreement [FN23] by (1) soliciting insurance business from plaintiff's customers, (2) aiding another party in the solicitation of insurance business from plaintiff's customers and (3) using plaintiff's confidential information and trade secrets to plaintiff's detriment. I address this third allegation first. [FN24]

FN23. It is ironic that plaintiff's contract claims are now based on the 1996 agreement. Until discovery began in this case, the 1996 agreement appears to have disappeared from the memory of all concerned. When he left plaintiff, Everts was told that the 1993 agreement was the only restrictive covenant agreement governing his conduct. When plaintiff's counsel sent letters to Everts and

InterContinental, the letters alleged violations of the 1993 agreement. The contract claims in the original complaint were based on the 1993 agreement. Only after reviewing documents in response to defendants' discovery requests did plaintiff discover the existence of the 1996 agreement.

FN24. Defendants argue that the 1996 agreement is not enforceable because it was never signed by plaintiff or its predecessors. Everts is the party charged with performance, and there is no dispute that the agreement bears his signature.

*A. Analytical Framework*

In Massachusetts, [FN25] a restrictive employment covenant is enforceable if the employer demonstrates that the agreement is (1) necessary to protect a legitimate business interest of the employer, (2) supported by consideration, (3) reasonable in scope and (4) otherwise consonant with the public interest. *Whitinsville Plaza v.. Kotseas,* 378 Mass. 85, 102-03 (1979); *Alexander & Alexander, Inc. v. Danahy,* 21 Mass.App.Ct. 488, 496 (1986). Legitimate employer business interests include protection of trade secrets, confidential business information and good will. *All Stainless, Inc. v. Colby,* 364 Mass. 773, 779- 80 (1974); *Kroeger v. Stop & Shop Cos.,* 13 Mass.App.Ct. 310, 316 (1982).

FN25. The parties have spent considerable effort arguing choice of law. Because the 1996 agreement was signed in California, defendants assert that California law should apply. However, the agreement itself specifies that Massachusetts law applies; the agreement was signed in contemplation of a move to Massachusetts and the conduct constituting the basis of plaintiff's allegations occurred in Massachusetts. This is not a close case; I apply Massachusetts law. See *Morris v. Watsco, Inc.,* 385 Mass. 672, 674-75 (1982); *Steranko v. Inforex, Inc.,* 5

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                          Page 12

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

Mass.App.Ct. 253, 260 (1977).

*B. Confidential Information and Trade Secrets*

Upon termination, an employee "may carry away and use the general skill or knowledge acquired during the course of employment." *Dynamics Research Corp. v. Analytic Sciences Corp.,* 9 Mass.App.Ct. 254, 267 (1980) (citations and internal quotation marks omitted). He is not, however, permitted to use trade secrets or confidential business information. To determine whether information is a "trade secret" or "confidential business information" six factors are relevant: (1) the extent to which the information is known outside plaintiff's business, (2) the extent to which the information is known by employees and others involved in plaintiff's business, (3) the extent of measures taken by plaintiff to guard secrecy of the information, (4) the value of the information to plaintiff and its competitors, (5) the amount of effort or money expended by plaintiff in developing the information, and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 840 (1972). [FN26]

> FN26. I decline to give full effect to the definition of trade secret and confidential information in the agreement. That definition, under which those terms are "to be construed as broadly as possible," would include "all ... documents ... to which the Employee has access during the course of employment." Given the policy of the Commonwealth to enforce restrictive employment agreements only to the extent reasonable in scope, I look to the six traditional factors. Merely delineating examples of trade secrets and confidential information in an employment agreement does not, of course, substitute for record evidence that such actually existed. *Dynamics Research Corp.,* 9 Mass.App.Ct. at 277-78. However, as I discuss above, I assume that Everts was exposed to some information protected by the agreement.

The record before me is devoid of any direct evidence that Everts was in contact with confidential business information or trade secrets. Rather, the evidence indicates that Everts consulted insurance companies who did not limit their dealings to plaintiff but provided insurance quotes to others in the insurance brokerage business. The client information Everts possessed was available to any person who asked the client, assuming the client was willing to speak with such person. Besides including a very broad definition of the terms "trade secrets" and "confidential information" in the 1996 agreement, there is no evidence that plaintiff took measures to protect the secrecy of any information or designated specific information confidential. Even the November 9, 1998 memorandum which Everts took is not marked confidential. The record also indicates that Everts retained a memory of the customers he served. Nowhere in plaintiff's submissions is there evidence that establishes a disputed factual issue on this point.

**\*7** Nonetheless, drawing all favorable inferences in favor of plaintiff as the non-moving party, and given the examples included in the 1996 agreement, I assume that while employed by plaintiff and its predecessors Everts was exposed to some information protected as trade secrets or as confidential business information, and I assume that the November 9, 1998 memorandum falls within this category.

However, even with this assumption in plaintiff's favor, the record does not show that Everts used any confidential information. Defendants have established that the information Everts used when he contacted the 13 companies that switched to InterContinental was his own recollection that he had serviced these accounts when working for plaintiff (and, in some cases, before working for plaintiff). The evidence does not show that this information--the fact that these companies were customers of plaintiff--is protectible information. There is no evidence, for example, that the product or service provided (insurance and risk management) is purchased only by a small percentage of potential clients, such that identity of those who buy is a valuable lead. The additional

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

information Everts acquired--company-specific information as to insurance needs and premium quotes from insurers--was readily obtainable from the companies and from the insurers, respectively. As for the November 9, 1998 memorandum and customer list, there is no evidence Everts made any use of this. Plaintiff points to no evidence from which it can be inferred that Everts utilized the list or memorandum in any way that caused damage to plaintiff.

For these reasons, I conclude that defendants are entitled to summary judgment on plaintiff's claim that Everts misused confidential information or trade secrets.

*C. Solicitation*

Plaintiff also argues that Everts violated the 1996 agreement by soliciting insurance business from plaintiff's customers or by aiding another party (presumably InterContinental) to do the same. At issue are the 13 companies that switched to InterContinental when Everts moved there. I note at the outset that there is no evidence in the summary judgment record from which a reasonable jury could conclude that InterContinental encouraged or even knew of Everts' contact with the 13 companies at the time Everts contacted those companies.

The terms of the non-solicitation portion of the 1996 agreement are broad. Under its terms, Everts cannot directly or indirectly "call upon, canvass, solicit or approach" companies on whose accounts he worked, for the purpose of "soliciting and/or providing to such client the type of business placed by such client" by and/or through plaintiff. The questions before me now are (1) to what extent this language is enforceable in Massachusetts, under the analytical framework applicable to restrictive employment covenants, and (2) whether the summary judgment record establishes a disputed factual issue for trial.

*1. Enforceability of the Language*

**\*8** As I note above, legitimate business interests of an employer include protection of trade secrets and

confidential information and protection of good will. The determination of whether a restriction is necessary to protect the good will of an employer often, as here, subsumes an analysis of whether the former employee has knowledge of "some business secret or confidential information." *All Stainless, Inc.,* 364 Mass. at 779-80. The question here is to what extent the language of the non-solicitation portion of the agreement is necessary to protect plaintiff's good will.

An employer's good will is traditionally defined as the employer's positive reputation with its customers or potential customers, generated by repeat business with existing customers or by referrals to potential customers. *Slate Co. v. Bikash,* 343 Mass. 172, 175-76 (1961).

Two considerations are relevant to determining whether a restrictive covenant is necessary to protect an employer's good will. First, the employer must demonstrate that his business involves good will. *All Stainless, Inc.,* 364 Mass. at 779. Second, the employee must be in a position where he can appropriate that good will. *Id.* An employee is in such a position when he has knowledge of the employer's trade secrets or confidential information or where the employee's close association with the former employer's customers might cause the customers to associate the employee, rather than the employer, with the service or products offered. *Id.* at 779-80.

I conclude that a bar against solicitation of customers could reasonably be found necessary to protect plaintiff's good will. The parties agree that plaintiff's business is of a type that involves good will (although they dispute who owns the good will). See *Alexander & Alexander, Inc.,* 21 Mass.App.Ct. at 497. Also, as the employee with responsibility for accounts, a producer is in a position where he is capable of appropriating any good will that belongs to plaintiff by his knowledge of any secret or confidential business information of plaintiff or by his close association with the customers.

While it may have been necessary for plaintiff to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                Page 14

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

bar Everts from soliciting customers on whose accounts he worked, I find and rule that the language of the agreement is too broad as a matter of law. The word "solicit" denotes an attempt to obtain something by persuasion, or to ask for the purpose of receiving. Black's Law Dictionary 1248 (5th ed.1979). Preventing Everts from attempting to persuade clients to move their accounts from plaintiff to a competitor could be found necessary to protect plaintiff's good will. However, the remaining terms, to "call upon, canvass ... or approach" sweep too widely. I construe the 1996 agreement strictly against plaintiff, because plaintiff is the drafter of the contract and because the contract is a postemployment restraint. [FN27] *Sentry Ins. v. Firnstein,* 14 Mass.App.Ct. 706, 707 (1982). Therefore, I focus on the word "solicit" and construe the non-solicitation clause to bar only this type of contact. [FN28]

> FN27. In *Alexander & Alexander, Inc.,* 21 Mass.App.Ct. at 498-99, the Appeals Court considered the enforceability of covenants not to compete that prohibit merely accepting or receiving business from particular companies. While the Appeals Court declined to nullify such language, that case differs from this case for several reasons. The Appeals Court there only affirmed the granting of a preliminary injunction. The Appeals Court also afforded the restrictive covenants the lesser scrutiny applicable to those arising out of the sale of a business, as distinguished from those arising out of an employer-employee relationship. Finally, the employee in that case entered into the covenants with the benefit of counsel. I do not consider that case as authority for the principle that an employee such as Everts can be barred from accepting or receiving business from customers of his former employer. Admittedly, Everts did more than merely accept or receive business. He contacted the companies himself. Nevertheless, on the record before me, I believe this case is distinguishable from *Alexander & Alexander, Inc.* In addition,

my analysis is based in part on a construction of the term "solicit ." See *infra* n. 28.

> FN28. This construction of the agreement's terms is supported by the language of the agreement. Section 2 is titled "non-solicitation." Subsection b places restrictions with respect to businesses plaintiff has "called upon or solicited (or to which [plaintiff] has submitted any proposal for the provision of services in The Business) ..." These businesses are said to include only those whose business the employee sought, negotiated for or to which he attempted to provide services. The language in the parentheses and the subsequent limiting clause are evidence that the terms "called upon" and "solicited" envision an active, persuasive undertaking, such as submitting a proposal, negotiating or attempting to provide services. They do not connote mere contact.

*2. The Summary Judgment Record*

**\*9** Applying the undisputed facts in the record to the 1996 agreement, I conclude that (1) the good will generated belonged to Everts, at least as to 12 companies and (2) Everts did not "solicit" any of the companies that switched to InterContinental.

As to 12 of the companies that switched to InterContinental, the undisputed facts show that the good will at issue was not that which plaintiff had previously acquired and Everts misappropriated. Rather, the good will was Everts' "own making, which he had developed with customers as a result of his own enthusiasm, personality and abilities." *First E. Mortgage Corp. v. Gallagher,* 2 Mass. L. Rptr. 350, No. 94-3727F (Suffolk Super.Ct. July 21, 1994) (Fremont-Smith, J.). See also *Alexander & Alexander, Inc.,* 21 Mass.App.Ct. at 497 ("Good will is of great importance in the insurance brokerage business. Customers have repeated and multiple insurance needs. Prompt service, integrity, and loyalty are of some importance to customers who would tend to rely on key personnel who have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                    Page 15

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

demonstrated those qualities in the past").

Everts came to work for plaintiff after gaining experience and skills in the insurance business. He wrote the only newsletter used as a marketing tool. While Everts was accompanied by Philip Edmundson and an assistant on several occasions, there is no evidence that these two played any role in gaining new business. More significantly, the record does not show that these two joined Everts on *any* visits with *any* of the relevant 12 companies. There is no evidence that Everts took advantage of any system or training special to plaintiff to obtain business.

Most importantly, Everts himself solicited the business of those 12 companies. Two of these companies, Sasaki Associates and Envirogen, were customers that Everts brought to plaintiff when he first joined plaintiff. "The objective of a reasonable noncompetition clause is to protect the employer's good will, not to appropriate the good will of the employee." *Sentry Ins.,* 14 Mass.App.Ct. at 708. See 6A Corbin, Contracts § 1391B (2000 Supp.).

To argue that there is evidence that plaintiff generated the good will at issue, plaintiff points to evidence that it provided clerical staff to Everts, sponsored Everts' attendance at the Miller Heiman sales training program and provided Everts with the office supplies he needed to conduct business. However, plaintiff does not show how this translates into good will. While hiring an employee and providing him with an infrastructure necessary for him to do his job undoubtedly gives an employer significant rights to control the employee's conduct, this does not mean that the good will which develops belongs to the employer. [FN29] There is no evidence from which a reasonable jury could find that this type of support served to enhance plaintiff's reputation with its customers in such a way as to generate good will. The undisputed fact that the 13 companies left plaintiff upon Everts' mere statement that he left plaintiff, without persuasion by Everts (as I discuss below), does not show that plaintiff's support created any loyalty to plaintiff. To the contrary, it tends to indicate trust in Everts.

FN29. The same is true with respect to any training provided to or performance improvement achieved by Everts while employed by plaintiff. "An opportunity to develop good will which is no different from the opportunity any other like employee in the industry would have with some other firm is not traceable to the particular position and situation of the employer ... Each party is entitled to keep the good will and reputation he would have had if he had never made a contract with this particular litigant, even though he may have had to make a contract with some other person in the same line of commerce to achieve that reputation and skill, or customer satisfaction." 6A Corbin, Contracts § 1391B(B) (2000 Sup.). See *Dynamics Research Corp.,* 9 Mass.App.Ct. at 274-75; *National Hearing Aid Ctrs., Inc. v. Avers,* 2 MassApp.Ct. 285, 292-93 (1974).

**\*10** Plaintiff also points to a statement in an answer to an interrogatory that plaintiff provided Everts with "support and advice in relation to developing marketing plans for prospective clients." Such evidence has the potential to show that some of the good will belongs to plaintiff. However, on the record before me, this scenario remains mere potential. Without any detail in the record to give meaning to the phrase, it adds virtually nothing to help plaintiff A finding that plaintiff generated the good will using Everts as its intermediary, based on this record, would be speculative. At this stage, after discovery, this evidence is insufficient to create a disputed issue of fact on the issue of who owns the good will related to the 12 companies, particularly since plaintiff would possess such information.

The situation is different as to the remaining company, Environmental Project Control. This was one of plaintiff's house accounts assigned to Everts. Thus, it became a client of plaintiff without involvement by Everts. I assume, for purposes of this motion, that it was plaintiff's good will that resulted in Environmental Project Control becoming

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

and remaining a client of plaintiff. [FN30] On the other hand, this company left plaintiff through the same means as the other 12, i.e., contact without persuasion by Everts. However, I conclude that the evidence does create a disputed issue of fact regarding the ownership of the good will created in connection with this company.

> FN30. The Corbin treatise recognizes that a prior customer-firm relationship demonstrates that the employer created the good will. 6A Corbin, Contracts § 1391B(B).

Even though I find that there is a disputed factual issue as to ownership of the good will as to this one company, I rule that the undisputed facts do not show that Everts violated the non-solicitation portion of the 1996 agreement as to any of the 13 companies that switched to InterContinental. Rather, the facts show that Everts contacted representatives of the companies, told them he was leaving plaintiff and told them where he was going. Construing the agreement as I believe I must, the critical undisputed fact is that Everts did not actively seek to persuade the companies to stay with him. Concern with an employee appropriating his former employer's good will is realized when the employee appeals to a customer to leave the former employer by, e.g., providing reasons to do so. Here, there is no evidence Everts disparaged plaintiff or told the customers that InterContinental would be a better firm for them. Everts merely informed the customers of facts, and the customers indicated they wished to remain with Everts. There is not even a hint of hesitation by any of the companies, or any other evidence that the companies considered remaining with plaintiff

In its brief, plaintiff argues that the circumstances of this case excuse its inability to provide direct evidence that Everts violated the 1996 agreement. Plaintiff contends there is ample circumstantial evidence from which a reasonable jury could find Everts improperly solicited plaintiff's customers. I disagree. While summary judgment does not require direct evidence, it does require enough evidence to create a genuine disputed factual issue material to

the case. On the record before me, there is insufficient evidence to create a disputed factual issue as to whether Everts improperly solicited plaintiff's customers.

*II. The Remaining Counts*

**\*11** The above analysis disposes of the remaining counts. Plaintiff's brief focuses on its breach of contract claim and only once references the remaining counts.

In Count III, plaintiff alleges that Everts breached the implied covenant of good faith and fair dealing. See *Anthony's Pier Four, Inc. v. HBC Assocs.,* 411 Mass. 451, 471 (1991). The undisputed facts do not support a claim that Everts violated this implied covenant while employed by plaintiff.

Count IV alleges that InterContinental interfered with plaintiff's contractual relations. The summary judgment record contains no evidence to sustain this count.

Count VI alleges that Everts interfered with plaintiff's advantageous relationships with its customers by soliciting insurance business from those customers and diverting them to InterContinental. As noted, the undisputed facts show that Everts only contacted those customers and did not seek to persuade them to leave plaintiff. Moreover, the facts do not support a finding that Everts' conduct was improper in motive or means. There is simply no evidence that Everts had an ulterior motive (e.g., to injure plaintiff) or used improper means such as deceit or coercion. See *Draghetti v. Chmielewski,* 416 Mass. 808, 816-17 (1994); *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 815 (1990).

Plaintiff argues that an improper motive may be inferred because Everts continued to work for plaintiff for more than a week after accepting an offer of employment from a competitor and before telling plaintiff he was leaving, because he kept the November 9, 1998 memorandum and attached client list, and because he contacted the 13 companies who switched to InterContinental. There

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                 Page 17

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

**(Cite as: 2001 WL 1334763 (Mass.Super.))**

is nothing improper in working for plaintiff after having accepted a job with a competitor. *Augat, Inc. v. Aegis, Inc.,* 409 Mass. 165, 172 (1991) (at-will employee may plan to go into competition with employer and take active steps to do so while still employed; policy considerations are that "at-will employees should be allowed to change employers freely and competition should be encouraged").

As noted, nothing appears to have resulted from Everts' taking of the November 9, 1998 memorandum. There is simply no evidence before me that Everts ever used the list for any purpose. It is difficult to see how Everts could have had an intent to steal these customers without evidence he used the list. For this same reason, and for the additional reason that the memorandum itself suggests that plaintiff may want to lose these small accounts, [FN31] it is difficult to infer an intent to injure plaintiff by taking the list. Finally, the facts show nothing improper in Everts' conduct toward the 13 companies who went to InterContinental.

    FN31. See page 12 of this memorandum.

Counts V and VII allege the tort of conversion and misappropriation of trade secrets and confidential information. As I discuss above, there is insufficient evidence in the summary judgment record that Everts improperly used any of plaintiff's trade secrets or confidential information. Even if I assumed that the November 9, 1998 memorandum and attachment contained protectible information, there is no evidence any harm resulted from this.

**\*12** Count VIII alleges that both defendants violated G.L.c. 93A. There is no evidence that InterContinental or Everts engaged in any wrongful conduct. More importantly, c. 93A does not apply to claims arising out of an employment relationship. *Manning v. Zuckerman,* 388 Mass. 8, 12-15 (1983); *Informix, Inc. v. Rennell,* 41 Mass.App.Ct. 161, 163, review denied, 423 Mass. 1110 (1996).

                    ORDER
For the foregoing reasons, defendants' motion for summary judgment is *ALLOWED.*

MUTUAL RECITALS

Trade Secrets and Confidential Information

Non-Solicitation

Non-Competition

Not Reported in N.E.2d, 13 Mass.L.Rptr. 716, 2001 WL 1334763 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in N.E.2d                                                                    Page 1

Not Reported in N.E.2d, 7 Mass.L.Rptr. 195, 1997 WL 414966 (Mass.Super.)

**(Cite as: 1997 WL 414966 (Mass.Super.))**

C

Superior Court of Massachusetts, Middlesex
County.
CALEY & WHITMORE CORPORATION
v.
Kevin WOODWARD and others. [FN1]

FN1. Rita M. Woodward, David W.
Griffith, individually and d/b/a Northeast
Analytical Instrument Service and
Calibration.

No. CIV.A. 97-03271.

July 17, 1997.

RAYMOND J. BRASSARD, Justice.

*MEMORANDUM OF DECISION AND ORDER
ON PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
INTRODUCTION*
**\*1** Plaintiff, Caley & Whitmore (C & W), seeks a
preliminary injunction, enjoining the defendants,
Kevin J. Woodward ("Kevin Woodward"), Rita M.
Woodward ("Rita Woodward"), David W. Griffith
("Griffith"), and Northeast Analytical Instrument
Service and Calibration ("Northeast"), from
engaging in any activities directly and indirectly
related to the service and calibration of balances
and precision scales within the New England area.
As the basis for its request for injunctive relief, C &
W contends that the defendants' actions since
leaving C & W violate a valid and enforceable
non-competition agreement between the parties.
For the following reasons, the plaintiff's motion for
preliminary injunction is *DENIED.*

*BACKGROUND*
C & W provides expert laboratory instrument and
equipment technical services throughout New
England. These services include repair,
maintenance and sales of balances, scales and other

equipment. C & W employs Field Service
Technicians who are dispatched to client facilities
to service their equipment.

In its service and sales files, C & W retains records
containing client contact names, direct line
telephone numbers for client contacts, information
relating to the charges each client pays, and client
service agreements and service schedules.

New England Balance Service Inc. ("NEBS") sells,
calibrates, and services balances and precision
scales. The founder and former president of NEBS
is Ken Lucier ("Lucier"). On February 4, 1985,
Lucier hired Kevin Woodward to work for NEBS as
a service technician. NEBS provided Kevin
Woodward with all his training in the field of
balance and precision scale service and calibration.
On December 24, 1986, Kevin Woodward signed
an employment agreement that contained two
clauses relevant to this motion. The first clause
was a covenant not to compete in New England
during the course of employment and for a term of
five years after the termination of employment. The
second clause was an agreement which stated, "...
upon the completion of twelve (12) years of
continuous employment and having rendered
faithful and diligent service said Employee shall be
entitled to the issuance of 24% of the outstanding
stock of the Employer Corporation, without cost to
said Employee."

On February 4, 1997, Kevin Woodward believed
that he was entitled to a 24% ownership interest in
NEBS, pursuant to the clause in the employment
agreement he signed on December 24, 1986.
Before the sale of the assets of NEBS to C & W,
Kevin Woodward had requested that NEBS issue to
him 24% of the stock. NEBS failed or refused to
transfer that 24% share of outstanding stock.

On March 21, 1997, NEBS sold all of its
approximately 2400 accounts to C & W of which

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                          Page 2

Not Reported in N.E.2d, 7 Mass.L.Rptr. 195, 1997 WL 414966 (Mass.Super.)

**(Cite as: 1997 WL 414966 (Mass.Super.))**

about 1200 were active at the time. As part of the sale, C & W purchased the right to solicit, and the information necessary to solicit, NEBS clients. C & W's purchase also included the covenant not to compete in the employment agreement between Woodward and NEBS. Prior to the sale of its assets to C & W, NEBS employed three or four individuals. C & W offered employment to all of the NEBS employees. Kevin Woodward was the only NEBS employee who refused employment with C & W.

**\*2** Northeast was founded by Rita M. Woodward, and employs Kevin Woodward. Northeast has a principal place of business in Pascoag, Rhode Island. Northeast is engaged in the business of servicing analytical and precision instrumentation, including balances and scales. Northeast's business competes directly with the business of C & W, particularly with C & W's New England Balance Service division. Northeast's customer base includes former NEBS and C & W customers. C & W alleges that Kevin Woodward made use of NEBS' service and sales files, containing customer information and service agreements, in order to take clients away from NEBS and C & W.

Griffith is a former employee of NEBS. He left NEBS over ten years ago and moved to Ohio where he started Lake Balance Company, Inc. ("Lake"). Lake also sells and services balances and scales.

At oral argument, counsel for the parties agreed that there are a number of companies in the business of scale and balance service and calibration in the New England area.

### DISCUSSION

"The issuance of a preliminary injunction generally rests within the sound discretion of the judge, after a combined evaluation of the moving party's likelihood of success on the merits, its claims of injury, and finally a balancing of the competing harms to each party." *General Accident Ins. Co. of America v. Bank of New England-West N.A.,* 403 Mass. 473, 475, 531 N.E.2d 252 (1988) (citing *Packaging Industries Group, Inc. v. Cheney,* 380 Mass. 609, 615, 405 N.E.2d 106 (1980)). A

preliminary injunction is a drastic remedy that the court should not grant unless the movant, by a clear showing, carries its burden of persuasion. Wright & Miller, 11 Federal Practice and Procedure, § 2948 (1973). If the moving party can demonstrate that an injunction is necessary to prevent irreparable harm to it and that granting an injunction poses no substantial risk of harm to the opposing party, a substantial possibility of success on the merits warrants issuing the injunction. *Packaging Industries,* 380 Mass. at 617 n. 12, 405 N.E.2d 106. This Court finds that plaintiff has failed to satisfy the requisite elements for a preliminary injunction.

C & W contends that Kevin Woodward's employment with NEBS began on December 24, 1986 when the employment agreement was signed. Kevin Woodward contends that he was an employee as of the date that he was hired, February 4, 1985. In his affidavit, Griffith states that Woodward was an employee as of February 4, 1985, and was in no sense a probationary employee. If Woodward prevails on this issue, a material breach of the agreement by the employer, NEBS, would make the employment agreement unenforceable as to Kevin Woodward, particularly in light of the close connection between the non-competition provision and the transfer of stock provision in the contract. *New England Canteen Services v. Ashley,* 372 Mass. 671, 676, 363 N.E.2d 526 (1977); *National Overall Dry Cleaning v. Yavner,* 321 Mass. 434, 440, 73 N.E.2d 744 (1947).

**\*3** Apart from the question of whether the employment agreement is not enforceable by C & W due to a breach by NEBS, this Court finds that there are no legitimate business interests for C & W to protect. *New England Canteen Services,* 372 Mass. at 674, 363 N.E.2d 526. There is nothing before the Court to indicate that trade secrets or confidential business information are being used by the defendants to further their own business. The information C & W contends is confidential is something a competitor could obtain simply by placing a telephone call to the prospective customer. C & W has also failed to establish that there are any trade secrets being used by the defendants to develop their own customer base.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                 Page 3

Not Reported in N.E.2d, 7 Mass.L.Rptr. 195, 1997 WL 414966 (Mass.Super.)

**(Cite as: 1997 WL 414966 (Mass.Super.))**

Further, C & W's allegation of irreparable harm
fails because C & W itself has quantified the
alleged harm sustained in its request for relief in the
amount of $200,000 for lost accounts and profits.
*Foxboro Co. v. Arabian Oil Co.,* 805 F.2d 34, 36
(D.Mass.1986).

*ORDER*

For the foregoing reasons, the plaintiff's motion for
a preliminary injunction is *DENIED.*

Not Reported in N.E.2d, 7 Mass.L.Rptr. 195, 1997
WL 414966 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.